Bank of Clarke County, Plaintiff, *v.* Theodore Gilman and Another, Defendants.

*Commercial paper indorsed "for collection" — respective rights and liabilities of the owner, and the bank in which it is deposited, and the correspondent of such bank — title thereto, in whom vested — revocation of the agency.*

Where persons, engaged in the business of banking and collecting, send to their correspondents or agents, in the regular course of business of receiving and sending notes between them for collection for mutual account, business paper received from customers for collection, the agent or correspondent acquires no better title to it or its proceeds than was possessed by the one transmitting it, unless he be a *bona fide* purchaser of it for value or advances are made upon it in good faith, without notice of any defect in the title.

When the owner of commercial paper delivers it for collection to Bank A, which forwards it for collection to Bank B, which in turn forwards it for collection to Bank C, to which it is paid, and Bank C, instead of paying the money to Bank B, retains and applies it on a debt due from Bank B, the owner (Bank A being insolvent) may recover of Bank C, because the paper until paid

remains the property of the owner, who indorses it for collection, and when paid, the title to the proceeds by way of substitution at once vests in the owner; and the person collecting it, or into whose hands the money comes, is liable to the holder for the veritable proceeds of the paper, or for the amount of such proceeds, if they become mingled with the collector's own money.

The rule within the State of New York is, that it is not within the implied authority of the collecting agent, when paper is to be collected at some place remote from that of the business of such agent, to employ a sub-agent in that locality, to make collection on account of the owner, but, in the absence of any understanding or agreement to the contrary, the collecting agent is deemed to employ such other collector on his own account, and the collecting agent becomes chargeable to his principal for the conduct of the bank or individual to whom he transmits his principal's paper for collection.

Whenever the owner chooses to revoke the agency conferred, he may seek the paper or its proceeds in the hands of the correspondent or his chosen agent, or follow it into whosesoever hands it may have gone, unless it shall have passed into the possession of a *bona fide* holder for value, who received it from a party clothed with apparent title.

The indorsement of commercial paper by the owner thereof "for collection" is restrictive, and notice to every subsequent custodian thereof that it remains the property of him who thus indorses it, and the general rule of law applicable to paper transmitted "for collection" applies (as well when the owner's agent is given authority to collect and credit) down to the point where the moneys shall have actually come into the hands of such agent.

The title to commercial paper indorsed for collection continues to be in the owner until paid, whereupon the title to the proceeds becomes vested in him, and so continues until he is able to reach it, and until the happening of such event he is clothed with the authority to revoke the agency and recover the check or the avails in the hands of any correspondent. The only exception to such rule is where the correspondent makes with the agent of the owner an express contract to purchase the paper, and, in pursuance thereof, actually pays to the agent the face value of it.

A course of dealing under which a correspondent of a bank credits it with all paper received, whether for collection or deposit, and if on presentation such paper is not paid charges the amount thereof against the bank, does not make such correspondent the owner or purchaser of the paper thus received by him.

One of the incidents of such legal relation is the possibility that if the collecting agent becomes insolvent, while the paper or its proceeds is in the hands of the sub-agent, the owner will seize the paper or its proceeds.

The correspondent of a bank with which commercial paper is left for collection does not become vested with the title to such paper, even though he has remitted to such bank on general account in anticipation of the collection of such paper.

SUBMISSION of a controversy upon an agreed statement of facts pursuant to section 1279 of the Code of Civil Procedure.

Plaintiff and the defendants are engaged in the business of banking, the former at Berryville, Va. ; the latter in the city of New York. On the 12th of January, 1892, the plaintiff sent to J. J. Nicholson & Sons, bankers at Baltimore, without any special instructions or previous special agreement varying the legal effect of its indorsement, a check for $500 of which it was the holder.

The check was drawn on the National Bank of the Republic, New York city, and was indorsed "For collection and credit of Bank of Clarke County. J. R. Nunn, Cashier."

J. J. Nicholson & Sons received it, and indorsed it: "Collect for J. J. Nicholson & Sons," and sent it by mail to the defendants. The defendants received the check on the morning of January fourteenth, but instead of presenting it to the National Bank of the Republic for collection, deposited it to their credit in the Manhattan Company indorsed "For deposit in the Manhattan Company, to credit of Gilman, Son & Company."

On the next day, January fifteenth, the Manhattan Company presented the check to the National Bank of the Republic for payment. It was paid, and charged to the account of the maker. But on January fourteenth J. J. Nicholson & Sons failed, and notice of it came to the defendants some time during the day.

This proceeding was instituted because the plaintiff insists that the check belonged to it at the moment it was presented to the Bank of the Republic for payment, and the proceeds of it likewise belonged to it, and that its agent having failed, and such failure having come to the knowledge of the defendants, it was their duty to have transmitted the proceeds of the check to the plaintiff. Were there no other facts than those we have referred to, it would at once be recognized that plaintiff's position was so well grounded as not to admit of debate even. But between the time when the check was received by the defendants and the hour when knowledge of the failure of J. J. Nicholson & Sons came to them, such things were done by the defendants, and such transactions took place between them and J. J. Nicholson & Sons, as persuades the defendants that they have the right to insist, and to be sustained in insisting, that plaintiff's check was by them paid to plaintiff's agents prior to the knowledge of the failure of such agents being brought home to them.

In the same inclosure by which J. J. Nicholson & Sons transmitted to the defendants for collection plaintiff's check, they sent other checks and sight drafts, which, with plaintiff's check, aggregated $12,700.98.

In accordance with the course of business between them this $12,700.98, when received by defendants on the morning of January fourteenth, was at once credited to Nicholson & Sons as cash, thus canceling an existing overdraft of $2,913.74, and giving them an apparent cash balance of $9,787.24, increased later in the day by two collections of $90 and $88.33 to $9,965.57.

While the defendants always credited J. J. Nicholson & Sons upon their books with all checks and drafts received, whether for collection or otherwise as so much cash, still it was the custom of the defendants to return to Nicholson & Sons checks thus credited to them when not paid on presentment, and to charge the same to their account. It was the agreement and course of business between Nicholson & Sons and the defendants, that defendants' collections on account of Nicholson & Sons should be remitted by payment of the drafts which Nicholson & Sons drew upon them on every day when sending a remittance (they usually drew one draft, which would cover nearly the entire amount of the remittance), and any smaller checks which Nicholson & Sons might have occasion to draw to make up the balance. Not only was this their custom, but it was their agreement that remittance should not be made in any other way. When sending the remittance of $12,700.98 by which Nicholson & Sons obtained, as we have observed, an apparent balance with defendants of $9,965.57, they drew a check against it for $10,330.73, which was presented to defendants for payment by its holder on the morning of January 14, 1892.

This left Nicholson & Sons' account with the defendants again overdrawn by $365.16. The defendants insist that this transaction was in effect a payment of the $500 check in question to plaintiff's agent; that the remittance was as effectively made out as if the defendants had, upon receiving the check, shipped $500 in gold to Nicholson & Sons; and that by this act their responsibility in the matter, either to Nicholson & Sons or to the plaintiff, came to an end.

There were still other transactions during the day, and before defendants learned of the failure of Nicholson & Sons.

After the payment of the $10,330.73 check other small checks of Nicholson & Sons, aggregating $216.74, were presented and paid, thus increasing Nicholson & Sons' overdraft to $581.90. Later in the day a note for $591.54, which defendants had previously received from Nicholson & Sons for collection, but which, not being at sight, they had not credited to them, was paid and credited, and thus the overdraft was canceled and a credit balance of nine dollars and sixty-four cents was created.

*Baldwin & Boston*, for the plaintiff.

*Parsons, Shepard & Ogden*, for the defendants.

PARKER, J.:

The general proposition which lies at the foundation of a discussion of the merits of this controversy found expression by the Court of Appeals, in *Dickerson* v. *Wason* (47 N. Y. 439), in the following language: "Where persons in the business of banking and collecting send to their correspondents or agents, in the regular course of business of receiving and sending notes between them for collection for mutual account, business paper received from customers for collection, the agent or correspondent acquires no better title to it or to its proceeds than was owned by the one transmitting it, unless there is a *bona fide* purchase of it for value or advances made upon it in good faith, without notice of any defect in the title."

The essential elements of this rule are presented by the proposition put, by way of illustration, in *Corn Exchange Bank* v. *F. N. Bank* (118 N. Y. 443), as follows: "When the owner of commercial paper delivers it for collection to Bank A, which forwards it for collection to Bank B, which, in turn, forwards it for collection to Bank C, to which it is paid, it has been held that, if Bank C, instead of paying the money to Bank B, retains and applies it on a debt due from Bank B, the owner (Bank A being insolvent) may recover of Bank C." And it is said that this is so because the paper, until paid, remains the property of the owner who indorses it for collection. (*Nat. B. & D. Bank* v. *Hubbell*, 117 N. Y. 384; *St. Louis*

& *San Francisco Ry. Co.* v. *Johnston,* 133 U. S. 566; *Manufacturers' Bank* v. *Continental Bank,* 148 Mass. 553; *First National Bank* v. *First Natl. Bank,* 76 Ind. 561.)

When paid, the proceeds, by way of substitution, at once vest in the owner, and the person collecting it or into whose hands the money comes is liable to the holder for the veritable proceeds of the paper, or for the amount of such proceeds, if they become mingled with the collector's own money. (*Commercial Bank of Penn.* v. *Armstrong,* 148 U. S. 50, and cases cited, *supra.*)

In some other jurisdictions it has been held to be within the implied authority of the collecting agent, when paper is to be collected at some place remote from that of the business of such agent, to employ a sub-agent in that locality to make collection on account of the owner. But in this State the rule is otherwise, and in the absence of any understanding or agreement to the contrary, is to the effect that the collecting agent is deemed to employ such other collector on his own account. Thus the collecting agent becomes chargeable to his principal for the conduct of the bank or individual to whom he transmits the paper for collection.

Whenever the owner chooses to revoke the agency conferred, he may seek the paper or its proceeds in the hands of the correspondent of his chosen agent, or follow it into whosoever hands it may have gone, unless it shall have passed into the possession of a *bona fide* holder for value, who received it from a party clothed with apparent title. (*People* v. *City Bank of Rochester,* 96 N. Y. 32; *Naser* v. *First Natl. Bank,* 116 id. 492.)

This right was, in the first instance, treated as an equitable one rather than one resting in contract, and the occasions for the assertion and enforcement of it doubtless arose from the insolvency of collecting agents, or from some other cause making it equally necessary to invoke the remedy. While the rights of the owner of commercial paper intrusted to an agent for collection merely, are of the character already asserted, yet, in order to secure all of its advantages, beyond question he must indorse the paper for collection.

Such an indorsement is restrictive and notice to every subsequent custodian of the check that it remains the property of him who thus indorses it. (*Bank* v. *Hubbell, supra;* *Bank* v. *Armstrong,* 148 U. S. 50.)

In this case the check was indorsed by the plaintiff "For collection and credit of Bank of Clarke County. J. R. Nunn, Cashier."

It is said that the use of the word "credit" in the indorsement changes the rule which would otherwise obtain. But this suggestion is disposed of by *Bank* v. *Hubbell* (*supra*). According to it, the general rule of law applicable to paper transmitted "for collection," applies as well when the owner's agent is given authority to collect and credit, down to the point where the moneys shall have actually come into the hands of such agent. Then the agent is authorized to credit the owner with the proceeds.

Thus it appears that when the check came into the hands of the defendants they were informed by the indorsement which the owner had placed upon the back of it, that Nicholson & Sons were simply the agents of the plaintiff, having authority to present the paper, demand payment of it, and if paid to credit the proceeds to the owner. And they are presumed to have known that the title to the check was still in the owner, and would continue in it down to the moment when it should be paid, and then the proceeds would be substituted in its place, the title thereto becoming at once vested in the original owner and holder of the check.

Further, they must be presumed to have known that the owner could pass by the agent whom he had selected, and demand either the paper or the proceeds of the paper from the defendants so long as either should continue to be in their possession. And that the effect of insolvency on the part of Nicholson & Sons would be to revoke their authority to act for the owner of the check.

The logical result of the authorities upon this general subject, to some of which we have referred, seems to be that the only duty which devolved upon Nicholson's correspondent was to present and demand payment of the check, and if paid remit the proceeds. That such action not only constituted the full measure of the correspondents' duty, but, further, that they had no right to do anything else. If the assertion of the right of a correspondent to deal differently with the paper of the owner thus coming to it for collection, should be sustained, the result would certainly be in hostility to the established doctrine that the title to such paper continues to be in the owner until paid, whereupon the title to the proceeds becomes vested in him and so continues until he is able to reach it,

and until the happening of such event he is clothed with the authority to revoke the agency and recover the check or the avails in the hands of any correspondent.

One of the incidents of this legal relation is the reasonable expectation that if the collecting agent becomes insolvent while the paper or its proceeds is in the hands of the sub-agent, the owner may interrupt the paper or its proceeds.   (*Bank* v. *Armstrong, supra.*)

This reasonable expectation, and the protection which it insures, might be defeated if the sub-agent could provisionally advance the amount to the insolvent agent.

In *Warner* v. *Lee* (6 N. Y. 144) the court, referring to a case where the correspondent had received from the agent of the owners a note for collection, said : "Under these circumstances, if he had made advances upon account of it, he could not have held the note nor its proceeds against the plaintiffs."

It has frequently been held that the correspondent does not become vested with the title to such paper, even when he has remitted on general account in anticipation of collection.   (*Dickerson* v. *Wason, supra ; Nat. Park Bank* v. *Seaboard Bank,* 114 N. Y. 28 ; *Arnot* v. *Bingham,* 55 Hun, 553.)

These decisions seem to be the logical and necessary result of the established doctrine that the title to such paper continues in the owner until payment, when the proceeds become vested in him as a substitute for the paper paid.   If there be any exception to the general rule, which we think the authorities completely establish, it would seem to be confined to a case where the correspondent makes with the agent of the owner an express contract to purchase the paper, and in pursuance thereof actually pays to the agent the face value of it.

If the effect of the transaction between Nicholson & Sons and these defendants is not to bring it within this possible exception, defendants would seem to be without defense in this controversy.

The defendants insist, among other things, that the facts stipulated in this submission establish that they had actually paid to the agents the amount of the check and had become the owners of it. That portion of the agreed facts upon which this contention is founded reads as follows : "By the agreement and course of business between Nicholson and the defendants, the sole method by which the col-

lections made by the defendants on account of Nicholson and Nicholson's customers, were remitted, or to be remitted, to Nicholson, was the honoring by defendants of drafts drawn upon them by Nicholson against the amount of Nicholson's remittances   *   *   *   without waiting for the collection of the paper against which they were drawn.   Said draft of $10,330.73, and said four drafts aggregating $216.74 (all paid by defendants before knowledge of Nicholson's insolvency), in connection with said existing overdraft of $2,913.74, were intended by Nicholson and the two defendants to be the means by which the payment of said amount of $12,700.98, including therein the amount of plaintiff's said check for $500, should be paid to Nicholson; and, so far as the agreement between Nicholson and the defendants provided, the defendants' responsibilities for the remittance to Nicholson of the proceeds of plaintiff's said check ended when they had thus honored drafts of Nicholson upon them equal to or in excess of that amount and of the amount of all other remittances theretofore made to them by Nicholson."

It will be observed that there was no express agreement with reference to the check in question.   The stipulation refers to the general agreement and course of business between Nicholson & Sons and the defendants.   There should be read in connection with it another stipulation contained in the facts agreed upon; it reads: "It was the custom of the defendants to return to Nicholson checks credited to them and not paid on presentment, and charge the same to the account of Nicholson."

According to their agreement and course of business then, the defendants credited Nicholson & Sons with all paper received, whether for collection or deposit, and, if on presentment such paper was not paid, then it was charged against Nicholson & Sons. Clearly, then, it was not the understanding or agreement of the parties that the defendant should become the owner of and absolutely bound to pay for all the paper with which they gave Nicholson & Sons credit upon their books.   Both the credit and advancement were merely provisional.   If the paper should be paid, the credit would stand, otherwise defendants would charge Nicholson & Sons with the amount of it, and return the dishonored paper.

It may be further said in this connection that the course of business between Nicholson & Sons and the defendants shows that the

latter relied as largely upon the responsibility of the former as upon the paper transmitted by them.    When the inclosure containing this and other checks was received Nicholson & Sons already had an overdraft of nearly $3,000, and, about the time of their receipt, Nicholson & Sons' check was presented for payment and paid in an amount exceeding by $365.16 their total credit, based upon checks and drafts, which might or might not turn out to be collectible.

To this situation the remarks of the court in *Bank* v. *Hubbell* (*supra*) are entirely applicable.

" The finding shows that the credit was a provisional one only. It was a mere matter of bookkeeping.    It would seem to have been more in the form of a memorandum of the different pieces of paper received, because if any were not paid such as went to protest were at once charged back upon the books of the firm against the plaintiff, and returned to it with the expenses of protest charged to it. The firm never became absolutely responsible to the plaintiff for the amount of these collections until the collections were actually made and the proceeds received by them."    So, here the defendants intended the credit to stand provided the check was paid, but not otherwise.    It was a conditional credit; a matter of convenient bookkeeping.    A mere statement of the facts, such as has been made, makes it sufficiently clear that there is no foundation for the claim that the defendants purchased the paper.

The transaction was in effect an advancement on general account, which, both on principle and authority, did not operate to divest the plaintiff and invest the defendant with title to the check.

The title to it then was in this plaintiff on the morning of the fifteenth, when the check was paid by the Bank of the Republic, at which time the defendants had full knowledge of the insolvency of Nicholson & Sons, which operated to revoke their authority as agents of the owner.    That being so, the right of plaintiff to recover of the defendants the proceeds is established by the universal consent of the authorities.

Plaintiff should have judgment, with costs.

VAN BRUNT, P. J., and FOLLETT, J., concurred.

Judgment ordered for plaintiff, with costs.