HEID BROS., Inc., v. COMMERCIAL NAT.
BANK OF HUTCHINSON, KAN., et al.
(No. 305–3623.)

(Commission of Appeals of Texas, Section B.
May 10, 1922.)

**1. Appeal and error ⟨key⟩843(2)—Question as to agency of successive banks handling drafts, or subagency of each, for its predecessor, need not be decided, where result would be same in either case.**

Where defendant sold grain to plaintiffs and shipped the goods, sending drafts through banks one of which collected and transmitted to another, which was made garnishee in buyer's action alleging goods were not as represented, it need not be determined whether each successive bank to which the drafts were sent was the direct agent of the seller, for the purpose of performing the act which fell to its share of the chain of proceedings, or whether all the subsequent banks are subagents each of its predecessors and all of the first bank, where the seller would have a right of action against the garnishee in either case.

**2. Banks and banking ⟨key⟩165 — Whether garnishee bank had credited proceeds to bank through which it received draft, held immaterial.**

In buyer's action against seller in which a bank holding the proceeds of seller's drafts was garnished, whether garnishee had credited such proceeds to another bank through which the drafts had been received *held* immaterial, since no mere bookkeeping between a bank and its subagent could change the parties' status or destroy their rights.

**3. Banks and banking ⟨key⟩165—Bank, which was seller's agent, could not recover proceeds of his drafts from another bank; that right belonging to seller.**

Where defendant grain company sold corn to plaintiff, making shipment and placing draft with local bank for collection, *held*, that the local bank was seller's agent, and where it had forwarded the drafts through other banks, one of whom was garnished, in the buyer's action against seller, the funds in the hands of the garnishee bank did not belong to such local bank, but to the seller.

**4. Banks and banking ⟨key⟩165 — Evidence ⟨key⟩354(5)—Buyer cannot garnish proceeds of draft which has been finally credited to seller by bank; ledger sheet of bank offered on question of bank's ownership of garnished funds was admissible.**

In buyer's action after paying seller's drafts for shipment, in which the funds were garnished, if the bank to which seller had delivered the drafts had credited the seller finally and in good faith therewith, the buyer could not take the proceeds under garnishment, and on the question whether such bank had finally credited the seller a ledger sheet of such bank was admissible.

**5. Evidence ⟨key⟩376(6) — President's testimony that various entries in bank's ledger sheet were made in regular course of business sufficient to make sheet admissible.**

Where a bank's ledger sheet sought to be introduced in garnishment proceeding consisted of entries made by various clerks in the regular course of the bank's business, *held*, that it was not necessary that employees be called to testify to the entries made in the sheet before the sheet could be admitted in evidence; the testimony of the bank's president that the entries were made in the regular course of business being sufficient.

**6. Evidence ⟨key⟩376(9)—Bank's president in actual daily supervision of its affairs may produce and vouch for its books.**

While a cashier would be competent to vouch for the accuracy of bank books, where the bank's president has actual daily supervision of its affairs, he is competent to produce the books and vouch for them.

**7. Banks and banking ⟨key⟩158—As to depositor seller's drafts on buyer, terms of notice in passbook became part of contract between bank and depositor.**

The terms of a notice in a passbook of seller depositing drafts on buyer, that "all items received by this bank for deposit are credited subject to payment reserving the right to charge back any item not paid," became a part of the contract between the bank and the seller accepting and retaining the passbook.

Error to Court of Civil Appeals of Eighth Supreme Judicial District.

Suit by the Heid Bros., Incorporated, against the Pierson-Lathrop Grain Company of Hutchinson, Kan., in which the Security National Bank of Dallas, Tex., was made garnishee, and in which the Commercial National Bank of Hutchinson, Kan., was made a party on application of the garnishee, and from a judgment for plaintiff, adjudging the funds in the hands of the garnishee subject to garnishment, the Commercial National Bank of Hutchinson, Kan., appealed to the Court of Civil Appeals (226 S. W. 806), which reversed the judgment and rendered judgment for the Commercial National Bank of Hutchinson, and the plaintiff brings error. Judgment of the Court of Civil Appeals and judgment of the district court reversed, and cause remanded for new trial.

R. B. Rawlins, J. U. Sweeney, and W. M. Coldwell, all of El Paso, for plaintiff in error.

Turney, Burges, Culwell, Holliday & Pollard, Goldstein & Miller, and Loomis & Kirkland, all of El Paso, C. M. Williams, of Hutchinson, Kan., and I. N. Watson, of Kansas City, Mo., for defendants in error.

HAMILTON, J. The statement of the case made by the Court of Civil Appeals, and adopted by us, follows:

---

"This suit involves a fund in the possession of the Security National Bank of Dallas, Tex., garnishee, in a suit brought by the appellee, Heid Bros., Incorporated, of El Paso, Tex., against the Pierson-Lathrop Grain Company of Hutchinson, Kan.

"The litigation arose out of the following facts: In August, 1918, Heid Bros. contracted to purchase three carloads of corn from Pierson-Lathrop Grain Company. The corn was shipped from Hutchinson, Kan. The initial carrier issued an order bill of lading covering each of the three cars. Each bill recites that it was issued for shipment of 60,000 pounds of corn received at Hutchinson, Kan., from the Kansas Grain Company, consigned to order of the Kansas Grain Company, destination El Paso, Tex., notify Pierson-Lathrop Grain Company at El Paso, Tex. The bills were indorsed in blank by the Kansas Grain Company and Pierson-Lathrop Grain Company.

"To cover the purchase price of the corn the Pierson-Lathrop Grain Company drew three demand drafts on Heid Bros. in favor of the Commercial National Bank, or order, amounting in the aggregate to $5,806.38. These drafts were attached to the bills of lading and delivered by the grain company to the Commercial National Bank of Hutchinson, Kan. The bank received same on August 27, 28, and 29, 1918. Upon their receipt the bank gave Pierson-Lathrop Grain Company credit for the amount of the drafts and entered such credits in the passbook issued to that company by the bank. The Commercial National Bank transmitted the drafts with the attached bills to its correspondent, the Fourth National Bank of Wichita, Kan. The latter bank transmitted the same to its correspondent, the Security National Bank of Dallas, Tex., which in turn transmitted the same to its correspondent, the Union Bank & Trust Company of El Paso, Tex. On September 3, 1918, Heid Bros. paid and took up the drafts and attached bills of lading from the latter bank, and received the corn from the terminal carrier. Prior to September 6, 1918, the El Paso bank remitted the proceeds to the Dallas bank. On the latter date the El Paso bank wired the Dallas bank to withhold payment, and in response to this wire the fund was held up by the Dallas bank. Mr. Moye, the vice president of the El Paso bank, testified that the wire was sent at the instance of Heid Bros., who stated the corn was in bad condition and they wanted to get a settlement with Pierson-Lathrop Grain Company before they received their money.

"On November 7, 1918, Heid Bros. filed suit in the district court of El Paso county, Tex., against Pierson-Lathrop Grain Company to recover the amount of the drafts so paid by them and an additional sum paid for freight and demurrage charges. It was alleged that the corn was inferior in quality to that purchased, and that the corn was held by plaintiffs subject to defendant's order. In effect, it was a suit for rescission. At the instance of Heid Bros., a writ of attachment was issued in that suit on November 7, 1918, and levied upon the corn. On the same date Heid Bros. sued out a writ of garnishment against the Security National Bank of Dallas, Tex., which was served.

"The garnishee answered, setting up that it had in its possession $5,806.38, being the proceeds received by it from the collection of three drafts drawn by the Pierson-Lathrop Grain Company on Heid Bros.; that said drafts, prior to their payment, had been received by the garnishee from its correspondent, the Fourth National Bank of Wichita, Kan., and by garnishee transmitted for collection to its correspondent, Union Bank & Trust Company, at El Paso, and, the said drafts having been collected by the El Paso bank, the fund was transmitted to the garnishee; that the fund was claimed by the Pierson-Lathrop Grain Company, the Fourth National Bank of Wichita, Kan., the Commercial National Bank of Hutchinson, Kan., and the Union Bank & Trust Company of El Paso, Tex., and the garnishee was unable to determine to whom said fund belonged and to whom it was indebted on account thereof, and asked that the claimants of the fund be brought into court and their rights determined and the garnishee protected.

"Service was obtained upon the various parties vouched in by the garnishee. Pierson-Lathrop Grain Company made no answer. The Fourth National Bank of Wichita and the Union Bank & Trust Company of El Paso filed disclaimers. The Commercial National Bank of Hutchinson, Kan., filed a lengthy answer claiming the funds.

"On March 5, 1919, in the suit of Heid Bros. against Pierson-Lathrop Grain Company judgment by default was rendered in favor of Heid Bros. for the amount sued for with foreclosure of attachment lien upon the corn seized under the writ of attachment and without prejudice to the right of plaintiff to proceed with its garnishment. The judgment recites that it was rendered upon notice to the defendants served out of the state and ordered that no execution issue except as provided by law. In the garnishment proceeding Heid Bros. set up that the funds held by the Dallas bank was the property of the original defendant in the suit and denied all of the allegations of the Commercial National Bank. On January 26, 1920, judgment was rendered in the garnishment proceeding in favor of Heid Bros. for the funds in controversy and against the claim of the Commercial National Bank.

"The case was tried before the court, which made findings of fact substantially as follows:

"First. That the three drafts were deposited by the Pierson-Lathrop Grain Company and credited to its account.

"Second. That the drafts were accepted for deposit by the Commercial National Bank subject to collection.

"Third. That said bank acted as agent for collection of the drafts.

"Fourth. That the proceeds of the drafts was the money of the Pierson-Lathrop Grain Company.

"Fifth. That after notice of the claim of Heid Bros. the Commercial National Bank had on deposit, arising from other sources than said drafts, funds equal to the amount of the drafts.

"Sixth. That no evidence of any fraud on the part of Pierson-Lathrop Grain Company was offered in evidence other than the proceedings in the suit of Heid Bros. against the Pierson-Lathrop Grain Company.

"The court's conclusion of law was that the money in the hands of the Dallas bank was sub-

ject to the garnishment of Heid Bros., and that Heid Bros. were entitled to recover the same of the Dallas bank.

"The passbook of the grain company in which the credits were entered contains the following:

" 'Notice.

" 'All items received by this bank for deposit are credited subject to payment, reserving the right to charge back any item not paid.'

"The exact nature of the indorsements upon the drafts are not clearly shown. In the statement of facts the drafts are referred to as Exhibits H, I, and J. It is said of Exhibit H:

" 'The indorsement stamp of the Commercial National Bank of Hutchinson, Kan., dated August 27, 1918, of the Fourth National Bank of Wichita, Kan., dated August 28, 1918, and of the Security National Bank of Dallas, Tex., dated August 29, 1918, appear on the back of said draft; also the figure "2" with a circle around it.'

"As to Exhibit I it is said:

" 'This draft is similar in all respects to Exhibit H, except the following: The date of the draft is August 28, 1918. The indorsement stamp of the Commercial National Bank of Hutchinson, Kan., is August 28, 1918, of the Fourth National Bank of Wichita, Kan., is August 29, 1918, and of the Security National Bank of Dallas, Tex., is August 30, 1918. The figure "2" with circle around it does not appear.'

"As to Exhibit J it is said:

" 'This draft is similar in all respects to Exhibit H, except the following: The date of the draft is August 29, 1918, and the amount $1,943.70. The date of the indorsement stamp of the Fourth National Bank of Wichita, Kan., is August 30, 1918, and of the Security National Bank of Dallas, Tex., is August 31, 1918. The indorsement stamp of the Commercial National Bank of Hutchinson, Kan., does not appear on the back, and the figure "1" instead of "2" appears, with a circle around it.' "

The face of each of the drafts, except the varying amounts, was as follows:

"Hutchinson, Kansas, Aug. 26, 1918.

"On demand pay to the order of Com. Nat. Bank $1,931.34 nineteen hundred thirty-one and $34/100$ dollars, value received, and charge the same to the account of

"Pierson-Lathrop Gr. Co.,

"Per Chas. G. Smith.

"To Heid Bros., Inc., El Paso, Texas."

The Court of Civil Appeals held that "a bank which accepts paper for collection acquires no title to the paper," that "in such a case the bank acts as a collecting agent and title remains in the depositor," but, also, held "that the bank takes title to the proceeds of a check or draft deposited with it for collection immediately upon crediting the depositor with the amount of such proceeds." 226 S. W. 806. In support of this holding, it quotes from the opinion in the case of Continental Bank of New York v. Weems, 69 Tex. 489, 6 S. W. 802, 5 Am. St. Rep. 85, as follows:

" 'We think these facts settle the question of trust in the affirmative. If the securities had been sent for collection merely, the proceeds to be credited to the New York bank, it is clear *that after their collection, the relation of debtor and creditor would have subsisted, and the latter would have no claim upon the funds.* But by the understanding between the banks and the actual transaction between the parties as shown by the agreed evidence, a special agency was created, and the city bank had no authority to hold and credit the proceeds of the notes, but was bound to remit them immediately to its correspondent. [Italics ours.]' "

[1] But in that case only two banks were involved—the transmitting bank and the collecting bank. If the securities had been sent for collection only, the proceeds would have been credited to the sending bank—the bank from which the collecting bank received the securities. In this case, the collecting bank, the Union Bank & Trust Company of El Paso, received the drafts from the garnishee, Security National Bank of Dallas, indorsed by that bank and its two predecessors in handling them. There is no evidence that the collecting bank credited the funds to the Commercial National Bank of Hutchinson. On the other hand, it remitted to Security National Bank of Dallas. This bank received the drafts from the Fourth National Bank of Wichita, Kan.

As said by our Supreme Court, in an opinion delivered through then Justice Phillips, in the case of First National Bank of Shreveport v. City National Bank, 106 Tex. 297, 166 S. W. 689, L. R. A. 1918E, 336:

"There is marked diversity of view in the authorities upon the question whether a correspondent bank, to which another bank receiving from an owner negotiable paper for collection transmits it for collection, is the agent of the owner or the forwarding bank, and whether the latter may be held for its negligence in such transactions. It has not been decided by this court, though reference was made to it and the state of the authorities upon it in City Bank of Sherman v. Weiss, 67 Tex. 331, 3 S. W. 299. That, in the absence of a special contract or established and understood usage to the contrary, the correspondent bank is the agent of the forwarding bank and not of the owner or holder of the paper delivering it to the forwarding bank, is the general rule adhered to by many courts of eminence in this country, among them the Supreme Court of the United States. The contrary holding has been as strongly announced and as firmly maintained by other courts of distinction, and has upon its side the weight of Chief Justice Marshall's opinion in Bank of Washington v. Triplett, 1 Peters, 25, 7 L. Ed. 37, and Chancellor Walworth's notable dissenting opinion in Allen v. Merchants' Bank, 22 Wend. 215, 34 Am. Dec. 289."

It is not necessary for us to determine that question in deciding this case. "Some of the opinions—those only of course which hold that the first bank, or any bank in the series, is not liable for the act of any subsequent bank or agent, but only for the due

performance of the especial task allotted to itself—regard each bank, and the notary too, if a notary is employed, not as the subagent of its predecessor or of the first bank, but as the direct agent of the owner of the paper, for the purpose of doing the precise act which falls to its share in the chain of proceeding. Thus, if the paper is transmitted through three banks to a fourth, which has to collect, and is by that fourth bank delivered to a notary to be protested, it is not correct, according to the doctrine of these cases, to regard the second, third, and fourth banks, and the notary, as subagents of the first bank, neither to regard the notary as the subagent of the fourth bank. But each successive party is deemed to be an independent agent directly of the owner of the paper, having for the scope of its agency, in the case of any one of the first three banks, only the transmission to the next; in the case of the fourth bank, the collection, or, in default of payment, the delivery to a proper party for protest; and in the case of the notary, the various acts which go to make up a legal protest. This view makes the owner's right of action exclusive; the first bank having no right to sue any other. But some of the other class of cases, which regard all the subsequent banks and the notary as subagents, each of its predecessor and all of the first bank, allow a double right of action against the one through whose default loss accrues; for these cases declare that the defaulting agent may be sued directly by the owner of the paper, who is the original principal in the whole series; and at the same time it is a necessity, resulting from the fact of the subagency, that suits may also be brought by that first agent who stands to all the subsequent ones in the relation of an immediate principal. It makes no difference that the first bank is regarded as liable for all the subagents. This gives the owner a right of action against the first bank, but does not deprive him of the collateral right to sue the defaulting subagent directly and primarily if he wishes. He simply has his election whether he will pursue his remedy against the one or the other." Morse on Banking (5th Ed.) § 250.

So, whether we regard each successive bank to which the drafts in this case were sent as the direct agent of the Pierson-Lathrop Grain Company for the purpose of doing the precise act which fell to its share in the chain of proceeding, or regard all the subsequent banks as subagents each of its predecessor and all of the first bank, Pierson-Lathrop Grain Company would have had a right of action against the Security National Bank of Dallas for the proceeds of the drafts in its possession.

[2] Those cases which hold with the New York rule with greatest strictness, and carry it to its fullest consequences, deny the right of the owner to sue the subagent, except that "where the transmitting bank becomes insolvent before the agent bank receives pay-

ment of the note, and the agent bank has not acquired a right to the note or its proceeds as a bona fide holder for value, the owner may recover the note or its proceeds if collected." Morse on Banking, supra; Bank of Clarke County v. Gilman, 81 Hun, 486, 30 N. Y. Supp. 1111. In so far as they so hold, we refuse to follow them.

In this case, the Security National Bank, garnishee, asserted no claim to the funds, but practically disclaimed in its answer in garnishment wherein it said: "That on account of the conflicting claims to the said fund, of which it has been advised by said different claimants, the garnishee is unable to determine to whom it is indebted on account of the said funds held in its hands from the collection of the said three drafts." The two other banks expressly disclaimed, and the grain company made no answer, leaving the Commercial National Bank of Hutchinson the only contestant.

There is no evidence in the record that garnishee had credited any one with the proceeds of the draft. Its answer does not state that the proceeds of the drafts had been credited by it to the Fourth National Bank of Wichita from which it received the drafts or to any other of the banks that handled the paper. But, even if it had been so credited, would the mere crediting of the remitting bank, or any of them, with the proceeds of the collection, preclude the owner of the paper from recovering those proceeds from that correspondent? We think not. "No mere bookkeeping between [a bank] and its subagent can change the actual status of the parties or destroy rights which arise out of the real facts of the transaction." Commercial National Bank v. Armstrong, 148 U. S. 50, 13 Sup. Ct. 533, 37 L. Ed. 363.

"In no case cited, and in none examined by us, has the mere crediting of the remitting bank by a correspondent employed by it to make collections been held to create in favor of the latter such an equity as can be successfully interposed as a defense to an action by the owner for the proceeds thereof. The transaction must in such cases, as all agree, in order to work an estoppel, amount to a payment in good faith to the transmitting bank of money realized upon collections by the means usually employed by banks in effecting exchange." Branch v. U. S. Nat. Bank, 50 Neb. 470, 70 N. W. 34; Commercial Nat. Bank v. Hamilton Nat. Bank (C. C.) 42 Fed. 880.

[3] The Commercial National Bank "acted as agent for the collection of the drafts" according to the findings of the trial court and the Court of Civil Appeals. Since it was agent, it was not the owner of the drafts. It could not be agent for Pierson-Lathrop Grain Company, in the collection of the drafts, and the owner of the drafts at the same time. It did not own the proceeds of the drafts by virtue of owning the drafts, and it could not become the debtor of Pier-

son-Lathrop Grain Company by virtue of these drafts until after its collection and possession of the proceeds of the drafts either actually or by settlement of accounts between itself and the garnishee in some of the ways customary among bankers. Old National Bank of Evansville v. German-American National Bank of Peoria, 155 U. S. 556, 15 Sup. Ct. 221, 39 L. Ed. 259. No actual collection and possession of the proceeds by the Hutchinson bank was made and had, and no constructive collection by settlement between itself and the Security National Bank, garnishee, is shown. Therefore Pierson-Lathrop Grain Company could have recovered the proceeds of the drafts from the Security National Bank if that bank had refused to pay the same to that company or its agent, because the grain company was the owner of the funds. Therefore the garnishee would be compelled to pay the fund to Heid Bros. on its judgment against Pierson-Lathrop Grain Company. This holding is based on the finding that the said bank acted as agent for the collection of the drafts.

[4] If the finding had been that the bank was owner of the drafts by virtue of having credited, finally and in good faith, the account of Pierson-Lathrop Grain Company with the amount of the drafts, of course plaintiff could not take the proceeds under garnishment. The Commercial National Bank of Hutchinson was entitled to all legitimate evidence in its favor on that question. In addition to the passbook issued by the bank to Pierson-Lathrop Grain Company, admitted in evidence, it offered the ledger sheet containing the entries by it showing all the money transactions between it and that company. The court excluded the ledger sheet. We think it was admissible, for whatever it was worth, in determining the ownership by the bank of the drafts, and, therefore, of the funds garnished.

[5] Mr. Asher testified that he was president of the bank; that the books of the bank were kept under his supervision; that the ledger sheet offered in evidence was one of the original sheets of the original ledger; that he got it out of the machine file; that these sheets when filed are filed in this form as permanent records; that he inspects the original sheets before they are put away and bound; that this was one of the sheets inspected and kept by him; and that the records of the bank are correctly kept. It is true that he testified, also, that he made none of the entries and they were made by various clerks in the bank in the regular course of the bank's business. We do not regard it necessary that these employees be called to testify to these entries before the sheet can be admitted in evidence. The testimony of the president of the bank was sufficient to render the sheet admissible. As is said in the case of Continental Bank v. First National Bank, 108 Tenn. 374, 68 S. W. 497:

"We think it not necessary that the bookkeeper who made the entries should be examined as to their correctness. At most, he could only testify that the entries made by him are true entries of transactions reported to him by others. In other words, he could only testify that he wrote down what others told him. The court knows, as a matter of common information, that there are many persons in the employ of banks, and each has his different department, and each transaction passes through the hands of several—it may be of many—persons. We take a deposit, for instance. It goes into the hands of the receiving teller, thence into the hands of a journal clerk, thence to the individual bookkeeper, or such other officials as perform the functions of these officers. When it reaches the hands of the bookkeeper, who makes the final entry, which stands as the true statement between the bank and depositor, it has gone through the hands of a dozen parties, perhaps, and the last party only records what comes to him through so many hands, and knows nothing, it may be, of the actual transaction. It would seem that the cashier, whose function it is to overlook all transactions at the counter, and over the books, and test each transaction through all its stages, would be the person most competent to produce the books and vouch for their accuracy."

[6] While the cashier would be competent to vouch for the accuracy of the books, we think, where the president has actual daily supervision of the bank's affairs, as in this case, he, also, is competent to produce them and vouch for them. Mr. Asher testified: "I am there in active charge and supervision of the bank every day." The sheet was admissible. Wigmore on Evidence, § 1530. Its exclusion was reversible error.

[7] In view of another trial, it may be well to say concerning the "notice" in the passbook of the grain company, set out above, that, by the weight of authority, the terms of that notice became a part of the contract between the bank and the Pierson-Lathrop Grain Company when it accepted and retained the passbook. The authorities are collated in an annotation to the case of Los Angeles Investment Co. v. Home Savings' Bank, 180 Cal. 601, 182 Pac. 293, 5 A. L. R. 1193.

The deposit slips were also admissible in evidence.

The Court of Civil Appeals correctly disposed of all other questions in the case.

We recommend that the judgment of the Court of Civil Appeals and the judgment of the district court be reversed, and that the cause be remanded for a new trial.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.

We approve the holding of the Commission of Appeals on the question discussed in its opinion.