**UNITED STATES NAT. BANK OF GAL-VESTON v. AZAR.**

No. 10305.

Court of Civil Appeals of Texas. Galveston.

Jan. 14, 1937.

Dissenting Opinion Jan. 27, 1937.

Rehearing Denied Feb. 25, 1937.

Terry, Cavin & Mills, V. W. McLeod, and O. B. Wigley, all of Galveston, for appellant.

McDonald & Wayman, Theodore R. Robinson, and H. E. Kleinecke, Jr., all of Galveston, for appellee.

GRAVES, Justice.

The findings of fact and law filed by the learned trial court in support of its judgment in this cause present so complete a statement, not only of the nature and result thereof below, but also of the controlling question this appeal involves, that they are here appended in full:

"Findings of Fact.

"I. I find that plaintiff, Dr. James A. Azar, on February 23, 1933, was a regular

customer and depositor of defendant United States National Bank, and had been furnished by said bank with one of its 'deposit-books,' which had printed on its fly page the following:

" 'All checks, drafts and other items not payable in Galveston, received by the United States National Bank, Galveston, for collection or credit, are taken at customer's risk. Said bank, as agent for customer or depositor, will forward direct or indirectly such items to banks or correspondents, which may be the bank or firm on which said items are drawn, but assumes and incurs no responsibility for neglect, default or failure of such banks or correspondents, nor for losses or delay occurring in the mails. Should any banks or correspondents convert the proceeds or remit therefor in checks or drafts which are dishonored, or should the item or proceeds be lost or not collected for any of the above causes, the amount for which credit has been given will be charged back to the customer or depositor.

" 'We will use our discretion as to sending direct or through intermediary banks for collection, acting as your agent only and assuming no responsibility beyond carefulness in selecting such agents.

" 'United States National Bank.'

"II. That on February 23, 1933, Azar deposited with defendant bank a sight draft payable to his order in the sum of $4,000, drawn by Eureka-Security Fire & Marine Insurance Company of Cincinnati, Ohio, on itself, payable at Central Trust Company of Cincinnati, Ohio, and in doing so used one of defendant bank's regular form of deposit slip, which had printed on its face the following:

" 'In receiving items for deposit or collection, this Bank acts only as depositor's collecting agent and assumes no responsibility beyond the exercise of due care. All items are credited subject to final payment in cash or solvent credits. This Bank will not be liable for default or negligence of its duly selected correspondents nor for losses in transit and each correspondent so selected shall not be liable except for its own negligence. This Bank or its correspondents may send items, directly or indirectly, to any Bank, including the payors, and accept its draft or credit as conditional payment in lieu of cash; it may charge back any item at any time before final payment, whether returned or not, also any item drawn on this Bank not good at close of business on day deposited.'

"Banks, in transmitting such items for collection, use one of two forms. One form reads, 'We endorse herewith for collection and credit items enumerated below'; the other advises, in effect, that the time item is forwarded 'for collection and return.' It is understood in the banking business that, when a bank receives a draft or check for collection from one of its customers and sends it to another bank for 'collection and return,' the collecting bank and all intermediate banks through which the item passes understands that the original bank wants the item collected and the cash or its equivalent remitted back to said forwarding bank; that when such an item is transmitted to a 'correspondent bank' for 'collection and credit' it is understood that the correspondent bank will collect the item and deposit the amount thereof to the account of the forwarding bank.

"The term 'correspondent bank,' when used by the forwarding bank, means a bank with which the forwarding bank maintains a deposit account. In sending such items for collection to a correspondent bank, they are usually, but not always, sent with instructions to collect and credit the amount of the item to the forwarding bank's account.

"On the 23d day of February, 1933, Union Trust Company of Cleveland, Ohio, was a 'correspondent' of defendant United States National Bank, with which the United States National Bank had on deposit approximately $7,000.

"III. The draft in question was forwarded by defendant bank to its correspondent, Union Trust Company, of Cleveland, Ohio, by airmail on February 23, 1933, for 'collection and credit,' and was received by Union Trust Company on February 24 and credited to United States National Bank's deposit account, thereby raising its credit balance to the sum of approximately $11,000. Union Trust Company of Cleveland, on the same day it received the draft, forwarded it to its correspondent, the Federal Reserve Bank at Cincinnati, who received the draft on Saturday, February 25, and collected the amount thereof from the drawer of the draft, and, on the same day, gave Union Trust Company credit therefor. I find, therefore, that defendant bank, through its correspondent, collected the

draft on February 25, and on that day the amount of the draft was deposited or credited to its account with the Union Trust Company.

"IV. On Tuesday, February 27, 1933, United States National Bank wired Union Trust Company, requesting said Union Trust Company to transfer $7,000 of its credit balance to the Federal Bank at Houston, Tex. On Wednesday, February 28, 1933, Union Trust Company wired United States National Bank as follows:

"'Due to action of Cleveland Clearing House limiting withdrawals to 5% on all accounts, we are unable to effect transfer per your wire request of yesterday. Any credits made on your account on and after February 27 will be considered a trust deposit and subject to withdrawal in full as realized.'

"On receipt of this wire United States National Bank charged the $4,000 item back against Dr. Azar's account.

"V. On March 23, 1933, United States National Bank received from the assistant conservator in charge of the affairs of Union Trust Company a remittance equal to 5 per cent. of its credit balance ($11,000) with Union Trust Company, as of the close of business Saturday, February 25, 1933. On July 27, it received an additional 35 per cent. of its credit balance, and on December 10, 1934, it received an additional 10 per cent. of its credit balance. On these respective dates United States National Bank credited Dr. Azar's account with 5 per cent., 35 per cent., and 10 per cent., respectively, of the amount of said draft, or a total credit of $1,910.

"VI. Defendant bank takes the position that under its deposit slip it was Azar's agent to collect the draft and that this relation was not changed even though its correspondent, Union Trust Company, collected the draft and gave it credit therefor on its deposit-account. Azar, on the other hand, while admitting that the bank was his agent to collect the draft under the terms printed on the deposit slip and in the passbook, takes the position that this relation was changed to that of debtor when the bank collected the draft and deposited it to its account in Union Trust Company.

"I, therefore, find and conclude as a matter of law that as soon as Union Trust Company made final collection of the draft and gave defendant bank credit therefor on its deposit account. Union Trust Company ceased to be the agent of defendant bank and Azar, but from that time on was a creditor (debtor) of defendant bank, and that defendant bank, having used the proceeds of the Azar draft in this manner, likewise became Azar's debtor. Defendant bank never intended for Union Trust Company to remit to it the proceeds of the draft, but intended to have it collected and deposited to its account, which was done. These changes in relation from principal and agent to debtor and creditor were effected before the close of business on February 25. At this time defendant bank was a creditor of Union Trust Company in the amount of about $11,000, which included the Azar draft, and I conclude that at said time defendant bank became the debtor of Azar. This being so, I conclude the loss from the failure of Union Trust Company must fall on defendant bank and not on plaintiff. The rights of the parties were determined and fixed before Union Trust Company was put on a restricted basis, and hence I conclude that the fact that it suspended operations on the next business day is immaterial and does not affect the decision of this case."

Concluding that it was right, this court approves the quoted findings and holdings of the court below; indeed, the findings of fact are in nowise disputed by either side, except that appellant corrects as a mere error of recital the trial court's statement in its finding IV that February 27 of 1933 was on Tuesday when it should have been on Monday; since the appellee does not challenge this change, it may be accepted as correct, thereby altering the chronology given in the findings to the further extent of saying this, that the draft was deposited at and sent from Galveston on Thursday, February 23, received in Cleveland by the Union Trust Company on Friday, February 24, forwarded by it that same day to Federal Reserve Bank at Cincinnati, received, collected, and credited by the latter to the Union Trust Company on Saturday, February 25; that thereafter, on Monday, February 27, appellant sent its wire to the Union Trust Company at Cleveland, which answered it likewise by wire on Tuesday, February 28; otherwise than the restatement of the dates by the appellant, both sides accept the findings as reflecting the undisputed facts, appellant here limiting its attack to the legal conclusions of the court, concededly stated upon undisputed facts.

The indicated mixup in dates only in no-wise affects this court's approval of the legal principle it conceives to be controlling; the parties themselves are in complete agreement about everything else except as to the legal meaning of the sentence appearing in the form of deposit slip so used in this instance, "All items are credited subject to final payment in cash or solvent credits"; appellant basing its whole case upon the claim that it never got but $1,910 "in cash or solvent credits," as it was in that sentence in effect agreed upon that it should have, hence it was not liable for the remaining $2,206 of the $4,000 draft, for which sum the trial court gave the appellee judgment against it; whereas the appellee insists, as the trial court determined, that appellant did get such a solvent credit for the full amount when the Federal Reserve Bank of Cincinnati collected the full amount of the draft from the drawer thereof and credited it to appellant's "correspondent" within the meaning of that term—the Union Trust Company at Cleveland—at least one full business day before the restriction on withdrawals had been put on the latter by the Cleveland clearing house, and also a like full time before that "correspondent" of the appellant had suspended operations as a banking institution.

Under the mutually-accepted terms of the agreement itself between the appellant and the appellee, in accordance with which this transaction was handled, it seems plain that the denouement so found by the trial court to have changed the relation between them by making the appellant the appellee's debtor from and after such credit in the Union Trust Company of Cleveland on February 25th did have that effect; the appellant's cashier, Mr. Peterson, was the only witness testifying, and the trial court's statement of the facts was therefore based wholly upon what he said; there cannot be, consequently, any differences between the litigants as to there being a well-recognized distinction in the meaning of the phrases "for collection and credit" and "for collection and return"—his exegesis of that being precisely that adopted by the trial court; since, further, there is no doubt whatever that this draft was sent, understood as, and handled as one "for collection and credit" as so defined; this reduction to their ultimate of both the agreement and the procedure taken thereunder seems to clarify many if not all of the holdings of the courts cited in the briefs of both parties, and to make it clear that, upon the legal equivalent of the same state of facts, these authorities adduced by the appellee support the judgment herein: City Bank of Sherman v. Weiss, 67 Tex. 331, 3 S.W. 299; Heid Bros. v. Commercial Nat. Bank (Tex.Com. App.) 240 S.W. 908, 24 A.L.R. 904; 3 R. C.L. 261, p. 632; Maget v. Bartlett Bros. Land & Loan Co., 226 Mo.App. 416, 41 S. W.(2d) 849, 858; People v. Sheridan Trust & Savings Bank, 358 Ill. 290, 193 N.E. 186, 191; Michie on Banks and Banking (1931 Permanent Edition) c. 10, § 38, p. 50; First National Bank v. First National Bank, 55 Neb. 303, 75 N.W. 843.

These garbled excerpts from the opinion of the Supreme Court of Illinois in the Sheridan Case, supra, the material facts in which were on a parallel with those here involved, are thought to be apropos, and to voice the controlling principle in this cause also:

"The bank was required simply to collect in cash or solvent credits. When the collection was so made, the agency of the bank immediately terminated and the conditional credit that had been given by the bank to the candy company instantly became an unconditional credit. * * * Until the time that the check was collected, the candy company could have revoked the agency, but when the payment of the check was made, at the close of the business day on which the check was collected, the purpose of the agency had been completed and the relation of debtor and creditor was fixed between the parties. * * * Having in mind that it is admitted that the Federal Reserve Bank of Chicago on June 6 actually received the proceeds collected, the rights of the several parties interested were fixed thereby. The Sheridan Bank could not then, nor could any intermediate bank participating in the collection of the check, rescind its action, nor could any of the banks deny the existence of the unconditional credit to the funds entered upon their respective books of account. The contract between the Sheridan Bank and the candy company had been fulfilled through the collection of the check, the proceeds of which were available to the candy company at the very instant the check was collected and credit given upon the books of the Federal Reserve Bank of Chicago."

Without further discussion, an affirmance will be ordered.

Affirmed.

PLEASANTS, C. J., dissenting.

PLEASANTS, Chief Justice (dissenting).

When the majority of the court reached their conclusion as to the proper disposition of this appeal, I entered my dissent, and as directed by the statute now make and file this statement of the grounds upon which the dissent is based.

The material facts are fully set out in the opinion of the majority.

It seems clear to me that under the plain unambiguous contract made by the parties at the time appellant gave appellee credit for the draft it undertook to collect for him, it cannot be held liable for the failure of its correspondent bank, Union Trust Company.

This contract is fully set out in the findings of fact by the trial judge, which is copied in the majority opinion, and need not be here repeated.

Just how the clear unambiguous language of this contract can be ignored, because of the fact that if the draft had been indorsed to the Union Trust Company "for collection and return," it would have been the duty of the trust company to have forwarded the amount to appellant on the day it was received by the trust company, is beyond my comprehension. As shown by the contract between the parties, the draft was indorsed to the trust company "for collection and credit." As I understand the argument of the majority opinion, it is in effect that if the draft had been forwarded under an indorsement different from that required by the contract, the proceeds of the draft could have been forwarded to appellant before the close of business on the day it was received by the trust company and appellee would not have sustained the loss caused by the failure of the trust company, which occurred on the second day after the draft was collected. The fallacy of this contention is so apparent that argument is not necessary to demonstrate its unsoundness.

If there had been no contract between the parties at the time the draft was received by appellant and credited to appellee's account, under the well-settled rule of decision in this state, the trust company became the agent of appellee and appellant could not have been held liable for the default of its correspondent bank, unless it was guilty of negligence in selecting such correspondent. Tillman County Bank v. Behringer, 113 Tex. 415, 420 and 421, 257 S.W. 206, 36 A.L.R. 1302; Humble Oil & Refining Co. v. Wichita State Bank & Trust Co. (Tex.Civ.App.) 11 S.W.(2d) 644; Falls City Woolen Mills v. Louisville Nat. Banking Co., 145 Ky. 64, 140 S.W. 66.

The authorities seem to be uniform in the holding that the statement of the terms upon which a deposit is secured printed upon the passbook of the depositor, or upon the deposit slip at the time the deposit is made, becomes a part of the contract between the parties. It is thus shown by the undisputed record in this case that by agreement of the parties the appellant acted only as appellee's collecting agent and assumed no liability beyond the exercise of due care. Heid Bros. v. Commercial Nat. Bank (Tex. Com.App.) 240 S.W. 908, 24 A.L.R. 904; O'Hara v. Texas Nat. Bank (Tex.Civ. App.) 299 S.W. 649; Humble Oil & Refining Co. v. Wichita State Bank & Trust Co., supra; Jefferson County B. & L. Ass'n v. Southern Bank & Trust Co., 225 Ala. 25, 142 So. 66. The question of such negligence on the part of appellant is not raised by the pleadings or the evidence.

In my opinion, the provisions of the contract between the parties, before set out, the legality of which is not and cannot be questioned, not only forbids the affirmance of this judgment, but requires that this court reverse the judgment of the trial court and render judgment in favor of appellant, that the appellee take nothing by his suit, and that the appellant recover its costs.