GATEWAY STATE BANK, A Corporation, Appellee,

v.

The NORTH RIVER INSURANCE COMPANY, A Corporation, Appellant.

No. 85–1190.

Supreme Court of Iowa.

May 21, 1986.

 

Thomas J. Shields of Lane & Waterman, Davenport, and Edward P. McNeela and Neal R. Novak of McNeela & Griffin, Ltd., Chicago, Ill., for appellant.

Richard W. Farwell and James D. Bruhn of Shaff & Farwell, Clinton, for appellee.

Considered by UHLENHOPP, P.J., and McGIVERIN, LARSON, SCHULTZ and CARTER, JJ.

SCHULTZ, Justice.

This appeal involves the interpretation of a banker's blanket bond. Gateway State Bank initiated a declaratory judgment action against North River Insurance Company, claiming the loss the bank incurred was covered under the terms of the bond. Thereafter, both parties moved for summary judgment and the district court granted summary judgment for the bank. The insurance company appeals and asserts the terms of the bond do not cover the bank's loss. Since we agree with the insurance company, we reverse.

The facts are not in dispute. On February 5, 1982, North River Insurance Company issued a banker's blanket bond in favor of Gateway State Bank. Thereafter, the bank made three loans or "extensions of credit" to Russell Hayward, Jr. d/b/a Hayward Construction Company. Besides being in the excavation business, Hayward traded and purchased heavy construction equipment. The purpose of the loans was purportedly to finance equipment purchases. The loans were granted on September 8, 1982, in the amount of $78,000; September 14, 1982, in the amount of $30,000; and December 1, 1982, in the amount of $228,-650.

In each case, the bank extended credit in exchange for promissory notes executed by Hayward. Additionally, Hayward purportedly gave the bank a first lien on several pieces of equipment. In many instances, however, Hayward did not own the piece of equipment on the date of the loan or the equipment was encumbered by prior liens.

Hayward also supplied the bank with some false serial numbers of the purported collateral. The bank did not confirm or verify the serial numbers of the equipment pledged as collateral. The bank's president had examined a couple of pieces of equipment when he drove past Hayward's place of business. Otherwise, the bank never attempted to verify Hayward's ownership interest in the collateralized equipment or searched for liens against the equipment.

The latter part of December 1982 or early January 1983, the bank discovered Hayward's misrepresentations when other creditors of Hayward were claiming interests in the same collateral in which the bank thought it had a superior lien. Thereafter, Hayward defaulted on the loans and the bank was unable to collect on the promissory notes or the collateral. The bank attempted to recover for this loss under its banker's blanket bond. The insurance company specifically denied any and all liability under the terms of the bond.

November 10, 1983, the bank filed a petition for declaratory judgment against the insurance company. The petition sought a declaration of the rights and obligations of the parties pursuant to the banker's blanket bond. Specifically, the bank claimed its losses on the Hayward loans were covered under Clause B(1) and Clause E of the bond. March 15, 1985, the insurance company filed a motion for summary judgment claiming the losses sustained by the bank were not covered under the terms of the bond. The bank filed a resistance to the insurance company's motion and filed its own motion for summary judgment on March 22. July 31 the district court simply ruled on the motions for summary judgment as follows:

Plaintiff's motion for summary judgment is granted.

Defendant's motion for summary judgment is overruled. The insurance company filed its notice of appeal on August 19.

Initially, we note that the trial court did not state its conclusions for sustaining the bank's motion for summary judgment and overruling the insurance company's motion for summary judgment. *See* Iowa R.Civ.P. 118. We recognize that if a court does overrule a motion it is clear the trial court saw no merit in *any* of the grounds asserted therein. *Lewis v. State*, 256 N.W.2d 181, 196 (Iowa 1977). However, if the district court had stated whether it found coverage under Clause B or Clause E, or under both clauses, it would have eliminated unnecessary issues for appellate review. As it stands, the insurance company must argue every ground that the bank asserts is covered under the policy. *See* Iowa R.Civ.P. 118 advisory committee comment. Therefore, we review both Clause B(1) and Clause E of the banker's blanket bond.

Whether or not the bank's loss was covered under either clause of the bond depends on the construction we place on the terms of the bond. We turn to familiar principles of construction involving an insurance contract.

■ The cardinal principle of contract construction is that the intent of the parties must control and except in cases of ambiguity, this is determined by what the contract states. Iowa R.App.P. 14(f)(14). Since an insurance policy is a contract of adhesion, we construe its provisions in a light favorable to the insured. *Connie's Construction Co. v. Fireman's Fund Insurance Co.*, 227 N.W.2d 207, 210 (Iowa 1975). On the other hand, in examining an insurance policy, the words and phrases of the policy should not be strained to impose liability that was not intended and was not purchased. *State Farm Auto Insurance Co. v. Malcolm*, 259 N.W.2d 833, 835 (Iowa 1977); *Central Bearings Co. v. Wolverine Insurance Co.*, 179 N.W.2d 443, 445 (Iowa 1970).

■ The insurer assumes a duty to define, in clear and explicit terms, any limitation or exclusions to coverage expressed by broad promises. *Skyline Harvestore Systems, Inc. v. Centennial Insurance Co.*, 331 N.W.2d 106, 107 (Iowa 1983). If exclusionary language of the insurance is unambiguous, intent is then to be determined by what the contract itself states. *Rich v.*

*Dyna Technology, Inc.*, 204 N.W.2d 867, 871 (Iowa 1973).

■ I. Insuring Clause B is known as "on premises" coverage and provides in relevant part that the insurance company will indemnify the bank for:

### ON PREMISES

(B)(1) Loss of Property resulting directly from

(a) robbery, burglary, misplacement, mysterious unexplainable disappearance and damage thereto or destruction thereof, or

(b) theft, *false pretenses*, common law or statutory larceny, committed by a person present in an office or on the premises of the insured,

(Emphasis added.)

The bank claims its loss is covered under Clause B(1)(b) because Hayward made false and fraudulent representations to obtain the loans or extensions of credit. The insurance company counters that the loss which the bank claims is covered under Clause B is expressly excluded from coverage by Section 2(e) of the bond which states:

### EXCLUSION

Section 2. This bond does not cover:
....

(e) loss resulting directly or indirectly from the complete or partial non-payment of, or default upon, any loan or transaction in the nature of a loan or extension of credit, whether involving the insured as a lender or as a borrower, including the purchase, discounting or other acquisition of false or genuine accounts, invoices, notes, agreements or Evidences of Debt, whether such loan or transaction was procured in good faith or through trick, artifice, fraud or false pretenses, except when covered under Insuring Agreements (A), (D) or (E);

We need not decide whether the bank's loss resulted from "false pretenses" covered under Clause B(1). It is obvious that Section 2(e) expressly precludes coverage for the bank's claim under Clause B. The policy clearly and explicitly excludes a claim under Clause B for a loss resulting from the default on a loan even when it was procured by false pretenses.

■ II. Section 2(e) does not, however, preclude coverage under Clause E. That provision states:

### SECURITIES

(E) Loss resulting directly from the insured having, in good faith, for its own account or for the account of others,

(1) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of, or otherwise acted upon, any original

(a) Security,

(b) Document of Title,

(c) deed, mortgage or other instrument conveying title or, creating or discharging a lien upon, real property,

(d) Certificate of Origin or Title,

(e) Evidence of Debt,

(f) corporate, partnership or personal Guarantee, or

(g) Security Agreement

which

(i) bears a signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent, registrar, acceptor, surety, guarantor, or of any person signing in any other capacity *which is a Forgery*, or

(ii) is altered, or

(iii) is lost or stolen:

(2) guaranteed in writing or witnessed any signature upon any transfer, assignment, bill of sale, power of attorney, Guarantee, endorsement or any items listed in (a) through (g) above.

(3) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of, or otherwise acted upon any item listed in (a) through (d) above *which is a Counterfeit.*

Actual physical possession of the items listed in (a) through (g) above by the

Insured, its correspondent bank or other authorized representative, is a condition precedent to the Insured's having relied on the faith of, or otherwise acted upon, such items.

A mechanically reproduced facsimile signature is treated the same as a handwritten signature.

(Emphasis added.) The bank asserts its loss is covered under Clause E(1) because the documents executed by Hayward were forged and under Clause E(3) because the security agreements pledged on the loans were counterfeit.

The bank does not dispute that Hayward signed his own name to the promissory notes and security agreements. It contends, however, that it is entitled to recover under Clause E(1) because other jurisdictions have held that the definition of "forgery" includes not only a forged signature to a true instrument but also a real signature to a false instrument. All the cases cited by the bank to support this proposition were interpreting the common law definition of "forgery" because that term was not specifically defined in the bond. In this case, however, the banker's blanket bond was written on a form revised in July 1980 which includes a definition of "forgery."

Section 1. As used in this bond:

. . . .

(h) Forgery means the signing of the name of another with intent to deceive; it does not include the signing of one's own name with or without authority, in any capacity, for any purpose.

Since it is undisputed that Hayward did sign his own signature to the documents, they were not "forgeries" under the terms of the bond.

■ The bank also asserts that it is entitled to recover under Clause E(3) because the security agreements Hayward pledged to the bank were counterfeit. The term "counterfeit" is defined at Section 1(d) as "an imitation which is intended to deceive and to be taken as an original." The bank claims the security agreements were "counterfeit" because they were "not what they purport to be."

The Section 1(d) definition requires the document or writing simulate another document that is authentic. The security agreement pledged by Hayward was the original, it was not an imitation. We conclude from the clear language of the bond that the documents executed by Hayward were not counterfeit.

Further analysis supports this conclusion. A federal court interpreting the term "counterfeit," which was not defined in the bond, rejected assertions similar to the bank's in this case and stated:

There is a difference between extending credit on the basis of pledged counterfeit stock certificates, a risk clearly within purview of the bond, and extending credit on the basis of invoices that cover non-existent shipments and that have been submitted as evidence of previously pledged accounts receivable. The bank could verify the existence of the pledged accounts receivable by inquiring with the loan applicant's purported customer, while detecting a counterfeit security is likely to pose significantly different and more serious risks to the bank.

*Exchange National Bank of Olean v. Insurance Company of North America,* 341 F.2d 673, 676 (2nd Cir.1965). The deception or fraud perpetrated by Hayward did not arise from imitating authentic security agreements, but from misrepresenting his interest in the collateral. As such, the documents pledged by Hayward were not "counterfeit" under the ambit of the bond.

The bank concedes that if it is not entitled to recover under Clause B or Clause E there is no basis for its recovery of attorney's fees and court costs under Clause F of the bond.

In conclusion, the trial court erred as a matter of law in sustaining the bank's motion for summary judgment and overruling the insurance company's motion for summary judgment. Accordingly, we reverse the decision of the trial court and direct that judgment be entered in favor of North River Insurance Company.

REVERSED.