557 A.2d 747

**HAMILTON BANK and CoreStates Financial
Corp., Appellants,**

v.

**INSURANCE COMPANY OF NORTH AMERICA, Appellee.**

Superior Court of Pennsylvania.

Argued Dec. 13, 1988.

Filed April 14, 1989.

Daniel B. Huyett, Reading, for appellants.

Christopher W. Mattson, Lancaster, for appellee.

Before CAVANAUGH, McEWEN and POPOVICH, JJ.

POPOVICH, Judge:

This is an appeal from an order entered by the Lancaster County Court of Common Pleas, granting the appellee's motion for summary judgment against the appellant. We affirm.

When reviewing a lower court's entry of summary judgment, we are guided by the following standards of review which were recently reiterated in *Hower v. Whitmak Associates,* 371 Pa.Super. 443, 538 A.2d 524 (1988):

> Summary judgment should not be entered unless the case is free from doubt. *Weiss v. Keystone Mack Sales, Inc.,* 310 Pa.Super. 425, 456 A.2d 1009 (1983). Since the moving party has the burden of proving that no genuine issues exist as to the material facts, the record must be examined in a light most favorable to the non-moving party; in doing so all well-pleaded facts in the non-moving party's pleadings are accepted as true and that party is given the benefit of all reasonable inferences to be drawn therefrom. *Spain v. Vicente,* 315 Pa.Super. 135, 461 A.2d 833 (1983). Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Williams v. Pilgrim Life Insurance Co.,* 306 Pa. Super. 170, 452 A.2d 269 (1982).

*Hower,* 371 Pa.Superior Ct. at 445, 538 A.2d at 525; see also *Consumer Party of Pa. v. Comm.,* 510 Pa. 158, 173–75, 507 A.2d 323, 331 (1986); *In re Estate of Reinert,* 367 Pa.Super. 147, 150–52, 532 A.2d 832, 834 (1987); *Huffman v. Aetna Life and Cas. Co.,* 337 Pa.Super. 274, 276–77, 486 A.2d 1330, 1331 (1984).

The undisputed facts [1] are as follows: Between December of 1981 and June of 1982, Hamilton Bank and CoreStates

---

1. Bank contends that summary judgment was improper since a question of fact remains as to whether Humberto Tamez Garcia was its "authorized representative." (See Insuring Agreement (E), physical possession requirement.) Bank contends that "while Interbex and

Financial (hereafter "Bank") made sixteen loans totalling over $1.4 million to nine Mexican companies for the purpose of financing purchases of American goods for importation into Mexico. The loans were procured through Humberto Tamez Garcia, agent for the Mexican companies. Prior to dispersing the loan proceeds, Bank required the following documents: promissory notes signed by the debtor companies, sales invoices issued by the exporter and bills of lading from the carrier. For each of the loans, Bank accepted photocopies of the original counterparts of the bills of lading. After the Mexican borrowers defaulted on the loans, Bank discovered that the carriers' names on the bills of lading had been forged and that the description of the goods allegedly shipped was false.

Bank submitted claims for reimbursement under its export credit insurance provided by the Export–Import Bank of the United States and the Foreign Credit Insurance Association. FCIA denied the claims on the basis that the invoices and/or bills of lading were forged or otherwise fraudulent. Bank then filed its claim for $1.2 million ($1.4 million less policy deductible) with the Insurance Company of North America (hereafter "INA") under its bankers blanket bond.[2] Bank alleged that INA, under Insuring

Jeno were acting as agents for the Mexican borrowers in certain capacities, with respect to the shipment of the goods and the supply of appropriate documentation, they also acted as the agents of Bank." However, viewing the record in a light most favorable to Bank, the record reveals unequivocally that Humberto Tamez Garcia acted only as agent for the Mexican companies. The following facts bear that out: Tamez procured the now-defaulted loans on behalf of the Mexican companies. Tamez controlled the exporter, Interbex, and one of the debtors, FOCOINSA. In turn, FOCOINSA controlled the other exporter, Jeno. Sheila Harris, Bank's Foreign Trade Officer at the time the loans were made, stated Interbex and FOCOINSA (and consequently Jeno) "formed the hub of a spoked wheel configuration that linked all nine Mexican debtor importers and all sixteen loans to [Tamez] and his two companies[.]" (Affidavit of Sheila Harris, R.R., p. 88a–94a). The lower court correctly found that Tamez acted as the agent only for the Mexican companies and was not Bank's "authorized representative" for the purpose of interpreting the blanket bond.

2. Bankers blanket bond is an indemnity insurance contract that combines into one policy five separate "Insuring Agreements," each of which covers a different financial risk associated with banking. The

Agreement (E) of bankers blanket bond, agreed to indemnify Bank for losses resulting from Bank's having extended credit based in reliance on the forged bills of lading. In response, INA submitted that it was not liable under the agreement since Bank did not loan funds on the faith of the "original" bills of lading but rather made the loans based on photocopies of the documents. The lower court, ruling upon INA's motion for summary judgment, agreed with INA that, since Bank did not possess the original bills of lading, its claims were not covered under the blanket bond.

Insuring Agreement (E) which is the focal point of this dispute provides:

The Underwriter, in consideration of an agreed premium, subject to the Declarations, Insuring Agreements, General Agreements, Conditions and Limitations and other terms hereof, agrees to indemnify the insured for:

(E) *Loss resulting directly form the Insured having, in good faith, for its own accounts* or for the accounts of others,

(1) acquired, sold or delivered, or given value, *extended credit* or assumed liability, *on the faith of,* or otherwise acted upon, *any original*

(a) Security,

(b) *Document of Title,*[3]

(c) deed, mortgage or other instrument conveying title to, or creating or discharging a lien upon real property,

(d) Certificate of Origin or Title,

(e) Evidence of debt,

blanket bond is standard throughout the banking industry. *See United States National Bank in Johnstown v. Reliance Insurance Company,* 348 Pa.Super. 30, 501 A.2d 283 (1985).

**3.** Definitions, Section 1(e), Document of title was defined as "a bill of lading ... and also any other document which in the regular course of business of financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers and must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass."

(f) corporate, partnership or personal Guarantee, or

(g) Security Agreement

*which*

(i) *bears a signature of any* maker, drawer, issuer, endorser, assignor, lessee, *transfer agent,* registrar, acceptor, surety, guarantor, or of any person signing in any other capacity *which is a forgery,*[4]

(ii) is altered, or

(iii) is lost or stolen;

(2) guaranteed in writing or witnessed any signature upon any transfer, assignment, bill of sale, power of attorney, Guarantee, endorsement, or any items listed in (a) through (g) above.

(3) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of, or otherwise acted upon, any item listed in (a) through (d) above which is a Counterfeit.

*Actual physical possession of the items listed in (a) through (g) above by the Insured, its correspondent bank or other authorized representative is a condition precedent to the Insured's having relied on the faith of, or otherwise acted upon such items.*

A mechanically reproduced facsimile signature is treated the same as a hand-written signature. (Emphasis added).

Instantly, we are asked to review the lower court's interpretation of bankers blanket bond. Interpretation of an insurance contract is a question of law. *Utica Mutual Insurance Co. v. Contrisciane,* 504 Pa. 328, 334, 473 A.2d 1005, 1008 (1984); see also *Winters v. Erie Ins. Group,* 367 Pa.Super. 253, 257–59, 532 A.2d 885, 887 (1987). When interpreting an insurance contract, our duty is to determine the intent of the parties as manifested by the language of the written agreement. *Eddystone Fire Company v. Con-*

---

**4.** Definitions, Section 1(h), defines forgery as "the signing of the name of another with intent to deceive; it does not include the signing of one's own name with or without authority, in any capacity, for any purpose."

*tinental Ins.*, 284 Pa.Super. 260, 264–65, 425 A.2d 803, 805 (1981). The language of the policy, if unambiguous, should be given its ordinary and usual meaning. *Winters*, 532 A.2d at 887; *Techalloy Co. v. Reliance Ins. Co.*, 338 Pa.Super. 1, 5–7, 487 A.2d 820, 823 (1984); *Eddystone Fire*, 425 A.2d at 805. However, if the language is contextual or otherwise ambiguous, the insured receives the benefit of the doubt, and the policy language is construed in his favor. *Mohn v. American Casualty Co. of Reading*, 458 Pa. 576, 584–86, 326 A.2d 346, 351 (1974); *Winters*, 532 A.2d at 887; *Techalloy*, 487 A.2d at 823. The policy language is "ambiguous if reasonably intelligent men on considering it in the context of the entire policy would honestly differ as to its meaning." *Celley v. Mutual Benefit Health & Accident Ass'n*, 229 Pa.Super. 475, 481–83, 324 A.2d 430, 434 (1974).

The appellant raises numerous issues aimed at discrediting the lower court's interpretation of bankers blanket bond. However, applying the aforementioned standards to the case at bar, we are convinced that the lower court correctly interpreted the insurance contract. We find that the language of blanket bond is unambiguous and was drafted in clear and precise terms.

First, the appellant alleges that, since paragraph (1) of Insuring Agreement (E) does not contain the word "possession," requiring Bank to possess the original bills of lading ignores the explicit language of paragraph (1). In the alternative, Bank alleges that paragraph (1)'s requirement of document possession is unclear and ambiguous and should be interpreted in its favor. Here, we must disagree with the appellant and agree with the lower court's interpretation of the policy. If we were to view paragraph (1) in a vacuum, Bank's argument has some merit. However, when we read the Insuring Agreement as a whole, the specious nature of Bank's argument becomes abundantly apparent. Insuring Agreement (E) is quite explicit—"Actual physical possession" of the bills of lading is "a condition precedent to the [Bank's] having relied on the faith of" the bills. Equally unambiguous is the requirement of para-

graph (1) that recovery is predicated upon Bank's having extended credit "on the faith of ... original" bills of lading. Therefore, the clear meaning of the blanket bond mandates that Bank must physically possess the original bills of lading at the time of extending credit before it may recover its losses.

Bank further contends that, since the physical possession requirement of Insuring Agreement (E) does not specifically require possession of the "original" document, Bank's possession of *photocopies* of the original counterparts of the bills of lading is sufficient. However, as stated before, the possession requirement is to be read in conjunction with the paragraph (1) which premises recovery upon the Insured having acted "on the faith of" the "original" documents. When the possession requirement is read in conjunction with paragraph (1), the clear meaning of the policy language is that actual physical possession of the "original" bills of lading is a condition precedent to recovery.

Thus, we are led to the next issue: whether the undefined term "original," when considered in the circumstances of this case, is ambiguous. Here, we again agree with the lower court that the policy language, "original," is clear and free from ambiguity.[5] Bank contends that, especially in the commercial setting, "original" is capable of varied meanings, citing *Baum Estate*, 418 Pa. 404, 410, 211 A.2d 521, 524 (1965) ("original" capable of varied definitional treatment and may vary according to the situation). However, there can be no doubt that, considering the situation before us, mere *photocopies* of the original counterparts of the bills of lading do not qualify as "original" documents.[6] We

5. Black's Law Dictionary defines "original" as follows:
Original.... As applied to documents, the original is the first copy or archetype; that from which another instrument is transcribed copied, or imitated.... An "original" of a writing or recording is the writing or recording itself or any counterpart intended to have the same effect by a person executing or issuing it.

6. Bank, by its own admission, only had actual physical possession of photocopies of the original counterparts of the bills of lading. In other words, Bank merely possessed photocopies of duplicate bills of lading.

find it ludicrous that Bank, which certainly would not honor a photocopy of a check of nominal value, has the audacity to contend that it is reasonable to lend $1.4 million based upon mere photocopies of duplicate bills of lading.

In sum, we find that the bankers blanket bond is clear and free from ambiguity. In order to recover under the provisions of the bond, we find that Bank would have needed to extend the credit in reliance on original bills of lading (not mere photocopies thereof) which should have been in Bank's actual physical possession prior to release of the funds.[7] Since no genuine issues of material fact remain and, based on our interpretation of the bankers blanket bond, INA is entitled to judgment as a matter of law, we find that the lower court properly granted summary judgment in favor of INA.

Order affirmed.

**7.** Bank also contends that we must apply the doctrine of *contra preferentem* and thereby accept its reasonable expectations as the interpretation of the insurance contract. In *Winters, supra,* we explained that the focal point of interpreting contract language is the reasonable expectations of the insured. 532 A.2d at 887, citing *Collister v. Nationwide Life Insurance Co.,* 479 Pa. 579, 594, 388 A.2d 1346, 1353–54 (1978); see also *Huffman, supra.* However, we have found that the policy is clear and unambiguous and reasonable men could not differ as to its interpretation. Therefore, Bank's purely self-serving, allegedly reasonable expectations are not subject to consideration.