**NATIONAL CITY BANK OF MINNEAPOLIS, Respondent,**

v.

**ST. PAUL FIRE & MARINE INSURANCE COMPANY, petitioner, Appellant.**

No. C6-88-1378.

Supreme Court of Minnesota.

Nov. 3, 1989.

R.D. Blanchard, Thomas H. Crouch, Meagher, Geer, Markham, Anderson,

Adamson, Flaskamp & Brennan, Minneapolis, for appellant.

John H. Daniels, Jr., Robert R. Nardi, Willeke & Daniels, Minneapolis, for respondent.

David H. Gregerson, Lang, Pauly & Gregerson, Ltd., Minneapolis, for Transamerica Ins. Co. of California—Amicus.

Gregory M. Bistram, Leonard W. Glewwe, Moore, Costello & Hart, St. Paul, for Continental Ins. Co.—Amicus.

## OPINION

POPOVICH, Chief Justice.

As a result of the acceptance by respondent National City Bank of Minneapolis ("National City") of two fake stock certificates as collateral for a loan, the bank sought indemnification, following default by the borrower, under its Bankers Blanket Bond ("Bond") from appellant St. Paul Fire & Marine Insurance Company ("SPF & MI"). Appellant denied coverage under the Bond because the fake stock certificates were not "counterfeited" and because respondent failed to comply with the condition precedent requiring actual physical possession of the certificates before making the loan. The trial court held respondent did not comply with the condition precedent, but it need not because it would have made the loan in any event; the court, however, denied respondent's contract action because the fake stock certificates were not "counterfeited." A Minnesota Court of Appeals panel affirmed on the condition precedent, but reversed and found the fake certificates were "counterfeited," thus granting respondent indemnification. *National City Bank v. St. Paul Fire & Marine Ins. Co.*, 435 N.W.2d 57, 61–63 (Minn.App.1989). We reverse.

### I.

During 1979 or 1980, R.E. Clemens prepared or caused to be prepared two fake stock certificates that purported to have been issued by the Panhandle Eastern Pipe Line Corporation ("Panhandle") to R.E. Clemens. Panhandle is an actual corporation, with its stock publicly traded on the New York Stock Exchange. The first fake certificate bore the date August 2, 1976, CUSIP number "NCO 27399," and purported to represent 4,560 shares of Panhandle common stock. The second certificate, dated May 30, 1980, had a CUSIP number of "H 49467" and also purported to represent 4,560 shares of Panhandle common stock. A specimen copy of a Panhandle stock certificate had CUSIP numbers, engraving, signatures, a corporate seal, and a basic format that differed from the fake Panhandle stock certificates. R.E. Clemens Company, Inc., was the registered owner of three genuine Panhandle certificates representing four shares of Panhandle common stock, with serial numbers and dates similar to the fake certificates. Clemens apparently did not attempt to exactly duplicate the genuine Panhandle certificates.

On May 14, 1979, Clemens delivered to First National Bank of Minneapolis ("First Bank") the first fake stock certificate as security for a loan he was obtaining from it. Clemens pledged and delivered to First Bank the second fake certificate on August 20, 1980. Subsequently, Clemens was referred to respondent by an officer of another bank.

Clemens negotiated a loan with a senior vice-president of National City on December 17, 1981. Clemens included as assets in his financial statement the two fake Panhandle stock certificates, and it was determined the stock would adequately secure the loan. On December 17, 1981, Clemens and respondent entered into a loan agreement, which included Clemens' executing a $225,000 promissory note made payable to National City. Clemens also executed a security agreement in which he pledged to respondent the 9,120 shares of Panhandle common stock.

Before remitting loan proceeds to Clemens, National City telephoned First Bank to verify First Bank had possession of Clemens' two Panhandle stock certificates. Respondent did not obtain actual physical possession of the certificates before remit-

ting loan proceeds to Clemens on December 18, 1981, because First Bank still had possession of the fake certificates as security for the balance of its loan to Clemens. Respondent, moreover, did not contact Panhandle to verify issuance of the two certificates to Clemens. In fact, neither National City nor First Bank had a policy requiring verification of certificates with a publicly-held issuer, absent suspicious circumstances. If contacted, Panhandle would have had no record of the two certificates' being issued to Clemens.

On December 18, 1981, respondent loaned $194,000 to Clemens. National City made arrangements to pay Clemens' outstanding loan at First Bank and receive the Panhandle certificates. Respondent issued Clemens a bank money order made payable to First Bank. On December 18, 1981, National City prepared a letter on behalf of Clemens addressed to First Bank, instructing it to "forward [to respondent] by messenger the 9,100 + shares of Panhandle Eastern Pipe Line Company (two certificates) securing the loan." Clemens delivered the letter and money order as directed. On December 30, 1981, after the money order had been paid by respondent, First Bank delivered the two fake certificates to a National City loan officer, who looked at them, determined they were Panhandle stock certificates, and sent them to the vault. No one in respondent's collateral department questioned the authenticity of the certificates.

On December 31, 1981, the Federal Bureau of Investigation notified respondent that Clemens' two Panhandle stock certificates might not be genuine. By February 8, 1982, National City demanded from Clemens immediate repayment of the loan, which had an outstanding principal balance of $194,000.00 and accrued interest of $2,675.08. Respondent duly deducted $2,323.07 from Clemens' checking account. On November 22, 1985, Clemens paid respondent $21,400.00 as restitution against the loan obligation.

A Bankers Blanket Bond issued by SPF & MI to National City was in effect at all times material. The American Bankers Association and the Surety Association of America created a standardized bond form, commonly called the Bankers Blanket Bond "Form 24," which is used for insuring banks against all forms of losses. Following Clemens' default, National City sought, on February 23, 1982, indemnification from appellant under the Bond, but SPF & MI denied coverage. Insuring Clause (E) of the Bond provides coverage for losses resulting from an insured bank's good faith extension of credit in reliance on a counterfeit security. Clause (E) provides in relevant part:

> The Underwriter agrees to indemnify the Insured * * * for any loss * * * through the Insured's having, in good faith and in the course of business * * * extended any credit * * * on the faith of, or otherwise acted upon, any securities, documents or other written instruments which prove to have been
>
> (a) counterfeited or forged as to the signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent or registrar, acceptor, surety or guarantor or as to the signature of any person signing in any other capacity
>
>    *     *     *     *     *     *
>
> Actual physical possession of such securities, documents or other written instruments by the Insured, its correspondent bank or other authorized representative is a condition precedent to the Insured's having relied on the faith of, or otherwise acted upon, such securities, documents or other written instruments.
>
> The word "counterfeited" as used in this Insuring Clause shall be deemed to mean only an imitation of a security, document or other written instrument * * * which is intended to deceive and to be taken for an original.

National City, on February 10, 1983, brought a contract action against SPF & MI under Clause (E) of the Bond for indemnification of the loan losses resulting from its reliance on the fake Panhandle stock certificates. Appellant denied coverage, claiming respondent failed to comply with the condition precedent requiring actual physical possession of securities before ad-

vancing loan proceeds and that the fake certificates did not meet the "counterfeited" definition of the Bond. At trial on November 17, 1987, the parties stipulated the basic facts. The trial court held the actual physical possession condition precedent, though violated, did not bar recovery because the purposes of the condition were served since the Clemens loan would have been made even if the condition had been followed. The court, however, held the fake Panhandle certificates were not "counterfeited" because they did not imitate genuine certificates; thus respondent's contract action was denied.

The court of appeals panel affirmed in part and reversed in part, holding the trial court did not err in finding the failure to comply with the physical possession condition did not bar respondent's recovery. *National City Bank*, 435 N.W.2d at 61. The panel, however, held the fake stock certificates were "imitations intended to deceive and be taken for originals" and therefore were "counterfeit" under the Bond. *Id.* at 63. As a result, the panel remanded for entry of judgment in favor of National City and for consideration of attorney fees. *Id.* at 64. Appellant petitioned this court for review, which we granted.

## II.

■ "[I]nterpretation of the language of an insurance contract is a question of law, as applied to the facts presented." *Iowa Kemper Ins. Co. v. Stone*, 269 N.W.2d 885, 887 (Minn.1978) (citing *Associated Ind. Dealers v. Mutual Serv. Ins.*, 304 Minn. 179, 183, 229 N.W.2d 516, 519 (1975)). There is no dispute of material fact here, therefore we must independently review the lower courts' interpretation of the insurance contract.

The first issue is whether respondent complied with the Bankers Blanket Bond's condition precedent requiring actual physical possession of the fake Panhandle stock certificates prior to advancing loan proceeds to Clemens. This is an issue of first impression in this jurisdiction. Clause (E) of the Bond provides in relevant part:

Actual physical possession of such securities, documents or other written instruments by the Insured, its correspondent bank or other authorized representative is a condition precedent to the Insured's having relied on the faith of, or otherwise acted upon, such securities, documents or other written instruments.

Thus, under Clause (E) an insured bank cannot rely on a security unless the bank has actual physical possession of the security. Respondent did not have physical possession of the fake Panhandle certificates when it remitted the loan proceeds to Clemens on December 18, 1981, because First Bank still had possession of the certificates.

■ Clause (E) of the Bond, however, also allows an insured bank's "correspondent bank" or "authorized representative" to have physical possession on its behalf for purposes of satisfying this contract condition. First, we consider whether First Bank was a "correspondent bank" of respondent. Minnesota courts have not attached a precise definition to the term "correspondent bank," which is a term of art of the banking industry. A banking encyclopedia defines "correspondent bank" as:

A bank which is the depository for another bank is known as its correspondent. The correspondent bank accepts all deposits in the form of cash letters, and collects items for its bank depositor. The depository bank will render all banking services to its correspondent in the region in which it (the depository bank) is located.

*Thorndike Encyclopedia of Banking and Financial Tables* (pt. II) 137 (D. Benton, ed. 1985); *see also United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 114–16, 95 S.Ct. 2099, 2115–17, 45 L.Ed.2d 41 (1975); *Midland Nat'l Bank & Trust Co. v. First State Bank*, 175 Minn 555, 556, 222 N.W. 274, 274 (1928). A law dictionary similarly defines "correspondent" as a "bank or other financial organization which regularly performs services for another in a place or market to which the other does not have direct access." *Black's Law Dictionary* 311 (5th ed. 1979).

Despite the above definitions, respondent, quoting a 1973 banking encyclopedia, argues for an extremely broad definition. *Encyclopedia of Banking and Finance* 228 (7th ed. 1973). Appellant, however, cites two narrower definitions of "correspondent bank." *See Securities Fund Servs., Inc. v. American Nat'l Bank & Trust Co.*, 542 F.Supp. 323, 326 (N.D.Ill. 1982) (adopting Black's Law Dictionary definition); *United States Nat'l Bank v. Azar*, 102 S.W.2d 242, 243 (Tex.Ct.App. 1937) (corresponding bank "means a bank with which the forwarding bank maintains a deposit account"). The most accurate evidence of respondent's correspondent banks is the 1986 edition of *Polk's World Bank Directory* that lists seven banks—located in New York, Chicago, and San Francisco—as correspondent banks under the National City Bank entry. Neither this directory nor another banking directory relied upon by appellant lists First Bank as a correspondent bank of respondent. The trial court stated, "[T]he term correspondent bank as used in the [B]ond * * * is a term of art in the banking community and that National City Bank and First National Bank of Minneapolis did not have a correspondent bank relationship at the time of December 18th, 1981." Because no documents were ever exchanged between the two banks, neither bank maintained an account at the other bank, and the counterpart banking departments did not have an ongoing relationship with each other, we agree with the trial court's finding that under the accepted banking industry definition of "correspondent bank," First Bank was not a correspondent bank of respondent.

■ Next, we consider whether First Bank was an "authorized representative" of respondent. National City argues First Bank was its authorized representative because First Bank held the fake certificates for respondent from December 18, 1981, to December 28, 1981. The physical possession requirement, however, is a *condition precedent*, which mandates that an insured bank or its agent rely on the certificates *before* remitting loan proceeds. It is therefore irrelevant whether First Bank became an authorized representative of respondent *after* December 18, 1981.

In addition, being an "authorized representative" has an agency requirement. *See Citizens Bank v. American Ins. Co.*, 289 F.Supp. 211, 213 (D.Or.1968) (two banks' relationship of sharing loans made one agent of other under physical possession condition of outdated Bond). Respondent's dealings with First Bank were for the sole purpose of acquiring the Panhandle certificates. It was a mere coincidence First Bank was the depository of the fake certificates when National City negotiated the Clemens loan, thus there was no act making First Bank an "authorized representative" of respondent. The trial court determined:

> [A]s a matter of law First National Bank of Minneapolis did not serve as an authorized representative of National City Bank in this transaction for the purposes of possessing the certificates as contemplated under the [B]ond; and, therefore, I find that the possession requirement of the [B]ond is not satisfied.

The court of appeals panel did not disturb this ruling, and we agree.

■ Since the Bond's actual physical possession condition was violated, we consider next whether the violation bars indemnification of respondent. Even though neither respondent nor its agent actually possessed the fake certificates, the issue is whether National City is still permitted to rely on these certificates. No Minnesota decision addresses a violation of the Bond's condition precedent requiring actual physical possession of counterfeit documents. A condition precedent, however, is any fact or event, subsequent to the making of a contract, which must exist or occur before a duty of immediate performance arises under the contract. *Carl Bolander & Sons, Inc. v. United Stockyards Corp.*, 298 Minn. 428, 433, 215 N.W.2d 473, 476 (1974); 3A A. Corbin, *Corbin on Contracts* § 628, at 16 (1960); 5 S. Williston, *Williston on Contracts* § 666A, at 141 (3d. ed 1961). "[I]f the [fact or] event required by the condition [precedent] does not occur, there can be no breach of contract." *451 Corp.*

*v. Pension Sys. for Policemen and Firemen,* 310 N.W.2d 922, 924 (Minn.1981).

Few reported decisions are directly on point for a violation of such a physical possession condition. *Marsh Inv. Corp. v. Langford,* 554 F.Supp. 800, 804 (E.D.La. 1982), *aff'd in part and vacated in part on other grounds,* 721 F.2d 1011 (5th Cir. 1983); *Hamilton Bank v. Insurance Co. of N. Am.,* 384 Pa.Super. 11, 557 A.2d 747, 750–51 (Pa.Super.Ct.1989); *see also Liberty Nat'l Bank v. Aetna Life & Casualty Co.,* 568 F.Supp. 860, 863 (D.N.J.1983) (noting compliance with physical possession condition). In *Marsh,* on facts similar to this case, a bank sought to recover under Clause (E) of the Bond for a loan made based on several documents. The district court held the bank could not rely on the documents it never possessed, but other documents satisfied the physical possession condition and could be relied on by the bank. *Marsh,* 554 F.Supp. at 804. The Fifth Circuit affirmed on the physical possession condition issue, ruling: "The shareholder instruments could not form a basis of recovery because the bank did not have actual physical possession of them at the relevant time." 721 F.2d at 1014 n. 3. In *Hamilton,* Judge Popovich of the Pennsylvania Superior Court held a bank could not recover under Clause (E) because it had relied on copies of original documents, not having had actual physical possession of the originals when extending credit. 384 Pa.Super. at ——, 557 A.2d at 750–51. Both these courts thus gave full effect to the actual physical possession condition precedent.

◼ The Bankers Blanket Bond is designed to "protect [a bank] against risks of dishonesty, both external and internal, but does not insure good management nor against the risk of loss inherent in the banking operations." 9A J. Appleman & J. Appleman, *Insurance Law and Practice* § 5701, at 380 (1981) (footnote omitted); *Calcasieu–Marine Nat'l Bank v. American Employers' Ins. Co.,* 533 F.2d 290, 299 (5th Cir.), *cert. denied sub. nom. Louisiana Bank & Trust Co. v. Employers Liab. Assurance Corp. Ltd.,* 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976). The primary rationales for the Bond's physical possession condition are to allow an insured bank the opportunity to examine a document and to contact others to verify a document's authenticity. Although such verification is not required by Clause (E) of the Bond, a loss that could easily have been avoided is a business loss if sound business practice would have required some investigation. Checking a CUSIP number or calling a corporate secretary can quickly verify authenticity in most cases. Reliance on another bank's possession of stock certificates is not enough, since an insured bank has a duty to exercise some minimal level of care when making a loan. The failure to follow sound business practices and verify authenticity is a business risk taken by banks and not an insured risk covered by the Bond.

Despite finding a violation of the physical possession condition precedent, both the district court and the court of appeals panel advanced rationales for not enforcing the condition; neither, however, relied on any legal authority. On this issue the court of appeals panel cited only *Marsh,* distinguishing it on the ground that the bank in *Marsh* did not exhibit good faith, but here respondent acted in good faith in making the Clemens loan. *National City Bank,* 435 N.W.2d at 61. The *Marsh* court's denial of indemnification was based on the bank's not acting in good faith in relying on certain documents, on which it could have relied. The denial of reliance on other documents in *Marsh,* however, had nothing to do with finding the bank had not acted in good faith. An insured bank's "good faith" is a completely separate requirement from reliance "on the faith" of documents. *See United States Nat'l Bank v. Reliance Ins. Co.,* 348 Pa.Super. 30, 33–34, 501 A.2d 283, 284–85 (Pa.Super.Ct.1985) (holding good faith and reliance separate requirements); Haley, *Securities,* in *Bankers and Other Financial Institutions Blanket Bonds* 198, 206–08, 221–27 (1979). Thus, while good faith is a distinction between *Marsh* and this case, it is irrelevant whether an insured bank acted in good or bad

faith when complying with the condition requiring possession of a document.

In fact, no legal principle permits violation of a contract condition to be completely ignored. "A precedent condition * * * *must* be performed or happen before a duty of immediate performance arises * * *." 5 S. Williston, *supra*, § 666A, at 141 (emphasis added); *see also* 3A A. Corbin, *supra*, § 628, at 16. Neither the *Marsh* courts nor the *Hamilton* court considered not enforcing the condition precedent, simply enforcing the Bond's condition according to its terms—not a novel approach. The Bond's condition precedent must be enforced between the parties according to its terms. *See Ostendorf v. Arrow Ins. Co.*, 288 Minn. 491, 494–95, 182 N.W.2d 190, 192 (1970) ("courts will not redraft insurance policies in order to provide coverage where the plain language of the policy indicates that no coverage exists") (citing *Stein v. National Farmers Union Property & Casualty Co.*, 281 Minn. 287, 161 N.W.2d 533 (1968)).

We agree with the trial judge's findings that First Bank was neither a correspondent bank nor an authorized representative of respondent, and therefore the Bankers Blanket Bond's actual physical possession condition precedent was not met by respondent. As a result, respondent had no documents to rely on in making the Clemens loan, and appellant's obligation under the Bond to indemnify never arose.

## III.

The other issue is whether the fake Panhandle stock certificates were "counterfeited" securities as defined by the Bankers Blanket Bond. In order for respondent to recover under the Bond, it must have extended the Clemens loan based not on false documents in general, but on "counterfeited" documents. Interpretation of the Bond's definition is an issue of first impression in this jurisdiction. A 1931 Minnesota case did define "counterfeit" under an outdated Bankers Bond, *see Metropolitan Nat'l Bank v. National Sur. Co.*, 48 F.2d 611, 612 (D.Minn.1931) (defining "counterfeit" as a false image intended to be taken

as original or genuine), but substantial subsequent revisions in the Bond, including a specific definition of the term "counterfeited," have mooted that court's definition.

According to the Bond:

The word "counterfeited" as used in this Insuring Clause shall be deemed to mean *only an imitation* of a security, document or other written instrument * * * which is *intended to deceive and to be taken for an original.*

(Emphasis added). This definition was added to the standard Bankers Blanket Bond in 1969 in response to inconsistent interpretations of "counterfeited" in the courts. *Annotated Bankers Blanket Bond* § 5, at 90 (1980); *see William Iselin & Co. v. Fireman's Fund Ins. Co.*, 117 A.D.2d 86, 92, 501 N.Y.S.2d 846, 850 (N.Y.App.Div. 1986), *aff'd as modified*, 69 N.Y.2d 908, 508 N.E.2d 932, 516 N.Y.S.2d 198 (N.Y. 1987). As a result, decisions interpreting "counterfeit" before this time are minimally helpful, as is any case without the Bond's specific definition. A dictionary defines "counterfeit" as "[t]hat which is made in imitation of something, with a view to deceive." *Webster's New International Dictionary* 607 (2d ed. 1960). A law dictionary similarly defines "counterfeit" as "[t]o forge; to copy or imitate, without authority or right, and with a view to deceive or defraud, by passing the copy or thing forged for that which is original or genuine." *Black's Law Dictionary* 315 (5th ed. 1979).

Several courts have interpreted the same "counterfeited" definition found in Clause (E) of the Bond. *Bank of the Southwest v. National Sur. Co.*, 477 F.2d 73, 76–77 (5th Cir.1973); *Reliance Ins. Co. v. Capital Bancshares, Inc./Capital Bank*, 685 F.Supp. 148, 150–51 (N.D.Tex.1988); *Liberty Nat'l Bank*, 568 F.Supp. at 864; *Richardson Nat'l Bank v. Reliance Ins. Co.*, 491 F.Supp. 121, 123 (N.D.Tex.1977), *aff'd*, 619 F.2d 557 (5th Cir.1980); *Gateway State Bank v. North River Ins. Co.*, 387 N.W.2d 344, 348 (Iowa 1986); *William Iselin*, 117 A.D.2d at 89, 501 N.Y.S.2d at 848. All six of these decisions read the Bond's definition of "counterfeited" to require the fake

document be an imitation or duplicate of a preexisting genuine original document.[1]

In *Bank of the Southwest*, the Fifth Circuit held that a "white slip" was not counterfeited because it did not purport to be a direct imitation of an authentic original "white slip." 477 F.2d at 76–77. The court in *Reliance* stated: "The courts have consistently held that to be counterfeit under a Bankers * * * Bond, the allegedly counterfeit instrument must be an imitation of an actual existing (or previously existing) original genuine document." 685 F.Supp. at 150. In *Liberty*, the court held a CD was not counterfeit because it was not an imitation of a real CD. 568 F.Supp. at 863–64. The *Richardson* district court held there must be an original instrument in order for an imitation to be "counterfeit" under the Bond. 491 F.Supp. at 123. The Iowa Supreme Court interpreted "counterfeit" as "requir[ing] the document or writing simulate another document that is authentic." *Gateway*, 387 N.W.2d at 348.

In *William Iselin*, a lower New York appellate court—in a three-to-two decision—attempted to rebut the majority reading of this definition. 117 A.D.2d at 92–93, 501 N.Y.S.2d at 850. The dissent, however, strongly objected, stating the majority opinion was contrary to the overwhelming authority on the definition of "counterfeit." *Id.* at 94, 501 N.Y.S.2d at 851–52. An unanimous New York Court of Appeals summarily adopted the dissent's definition of "counterfeit" as including only those documents that imitate or simulate another authentic document. *William Iselin*, 69 N.Y.2d at 908, 508 N.E.2d at 933, 516 N.Y. S.2d at 198.

■ The basic rationale behind the definition of "counterfeit" is to require that an insurance company cover only non-business losses or insured risks, with a bank responsible for ordinary business losses. 9A J. Appleman, *supra*, § 5701, at 380 and n. 8.

An insured bank is not covered for mere loan losses resulting from a failure to follow sound business practices, since a bank can easily verify through minimal investigation if a fake document purports to be something that never was in existence. On the other hand, verifying the authenticity of a duplicate or imitation of a genuine document is unlikely to result in discovery of the fraud, a risk an insured bank cannot control. The Bond is not intended to cover this type of forgery loss. If a bank, such as respondent, chooses not to follow sound business practices and fails to investigate, verify, examine, or even possess securities before remitting loan proceeds, it cannot successfully claim this is an insured risk and not an ordinary business loss.

■ Though not directly on point or controlling, the majority of decisions, before Clause (E) was amended in 1969 to add a specific definition of "counterfeited," required an imitation of a genuine original document. *E.g., Richland Trust Co. v. Federal Ins. Co.*, 494 F.2d 641, 643 (6th Cir.1974); *Whitney Nat'l Bank v. Transamerica Ins. Co.*, 476 F.2d 632, 634–35 (3d Cir.1973); *Maryland Casualty Co. v. State Bank & Trust Co.*, 425 F.2d 979, 983 (5th Cir.), *cert. denied*, 400 U.S. 828, 91 S.Ct. 55, 27 L.Ed.2d 57 (1970); *First Nat'l Bank & Trust Co. v. United States Fidelity Guar. & Co.*, 347 F.2d 945, 947 (10th Cir.1965); *Exchange Nat'l Bank v. Insurance Co. of N. Am.*, 341 F.2d 673, 676 (2d Cir.), *cert. denied*, 382 U.S. 816, 86 S.Ct. 37, 15 L.Ed.2d 63 (1965); *Metropolitan Nat'l Bank*, 48 F.2d at 612. A minority of cases arising before the addition of the Clause (E) definition adopted a broad definition of "counterfeit" as anything not being as purported. *E.g., American Nat'l Bank & Trust Co. v. Fidelity & Casualty Co.*, 431 F.2d 920, 922 (5th Cir.1970); *United Pacific Ins. Co. v. Idaho First Nat'l Bank*, 378 F.2d 62, 69 (9th Cir.1967); *Fidelity Trust*

---

1. Insuring Agreement (E) has provided coverage for losses arising out of transactions involving counterfeited securities. A[n] instrument cannot be a counterfeit unless there is a corresponding original instrument in existence. A security or document is counterfeit only if it is an imitation, that is, if an attempt has been made to simulate another document which is genuine and the simulation is intended to deceive and be taken for the original. Neel, *Financial Institution and Fidelity Coverage for Loan Losses*, XXI Tort & Ins. L.J. 590, 612 (1986) (footnotes omitted).

*Co. v. American Sur. Co.,* 268 F.2d 805, 807 (3d Cir.1959) (repudiated in *Whitney,* 476 F.2d at 634–35).

The court of appeals panel held the two Panhandle certificates were "counterfeit" because they were "clearly intended to deceive and be taken for originals." *National City Bank,* 435 N.W.2d at 63. It relied on *American National Bank,* 431 F.2d at 922, which adopted an extremely broad definition of "counterfeit." The panels' reliance on preamendment cases, however, is erroneous. These cases are not directly applicable because they were decided under a general definition of an outdated Bond, not the definition of "counterfeited" now provided in Clause (E). In addition, these decisions represented the distinct minority of cases before the Bond's definition was added. Since the 1969 amendment to the Bond became effective, no court has interpreted this definition as the court of appeals panel did.

In light of the decisions under Clause (E)'s definition of "counterfeited" and the definition's underlying policies, we must deny respondent's indemnity claim. The Bond requires an imitation of a genuine document that is in existence. Respondent does not even contend the fake stock certificates were duplicates of genuine Panhandle stock certificates. Indeed, the fake Panhandle stock certificates were made on a standardized, generic stock certificate form, and were not imitations of genuine original Panhandle stock certificates. Thus, we reverse the court of appeals panel and hold the fake Panhandle stock certificates were not "counterfeited" as defined by Clause (E) of the Bankers Blanket Bond.

Because respondent's indemnification under the Bond is denied, its request for attorney fees must also be denied.

Reversed.

COYNE, J., took no part in the consideration or decision of this case.