# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 11-2082

NORTH SHORE BANK, FSB,

*Plaintiff-Appellant*,

*v.*

PROGRESSIVE CASUALTY INSURANCE COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 10-CV-00071—**Aaron E. Goodstein**, *Magistrate Judge.*

ARGUED OCTOBER 19, 2011—DECIDED MARCH 28, 2012

Before FLAUM and MANION, *Circuit Judges,* and MAGNUS-STINSON, *District Judge.**

MANION, *Circuit Judge.* A new customer of North Shore Bank named Russell Ott applied for a loan to finance the purchase of a motor home from the dealership that Ott

---

* The Honorable Jane E. Magnus-Stinson of the Southern District of Indiana, sitting by designation.

himself owned. To secure the loan, Ott presented the motor home's certificate of origin to the Bank and pledged the motor home as collateral. Unfortunately, when Ott defaulted on the loan two years later, the Bank discovered that it had been swindled: Ott's certificate of origin was a fake and the motor home pledged as collateral did not exist. The Bank sought to recover the loss from its insurance company, Progressive Casualty, but Progressive denied the Bank's request because Ott's fake certificate of origin did not meet the definition of a "Counterfeit" as specified under the terms of the insurance bond. The Bank then filed a diversity suit against Progressive in federal district court. Following cross-motions for summary judgment, the court ruled in Progressive's favor, finding that because the certificate of origin was not a counterfeit as defined in the insurance agreement, the agreement did not cover the Bank's loss. We affirm.

I.

In October 2006, a man named Russell Ott applied to North Shore Bank for a personal loan in order to purchase what he described as a 2007 Beaver Marquis motor home with a retail price of approximately $680,000. The loan amount he applied for was $404,881, so on the surface, it would appear that the loan would be well secured. But the unusual circumstance here was that Ott was purchasing the motor home from the Illinois dealership that Ott himself owned, ProSource Motorsports. At the time, every indication was that the dealership

was a successful business and would be a good new customer for the Bank. So apparently the size of the loan and the fact that Ott was buying the vehicle from his own dealership was not too great a concern for the Bank.

Still, because the Bank had no prior relationship with Ott or ProSource Motorsports, the Bank conducted some investigation of Ott and his dealership such as reviewing personal financial statements and income tax returns. On October 30, 2006, William Hintz, a representative of the Bank, traveled to Ott's dealership to inspect the motor home and the dealership; if all was well, Hintz was prepared to finalize the loan. Hintz toured the dealership, and observed and photographed the motor home represented by Ott to be the vehicle Ott was purchasing. Regrettably for the Bank, Hintz was not completely familiar with Beaver Marquis motor homes, and he accepted from Ott a document that Ott claimed was the original certificate of origin for the 2007 Beaver Marquis motor home Hintz was viewing. Hintz compared the vehicle identification number (VIN) on the certificate of origin Ott had given him with the VIN plate located on the wall of the motor home near the floor and behind the driver's seat. The two identification numbers matched, and Hintz then finalized the loan with Ott. Subsequently, the Bank submitted paperwork to the State of Illinois seeking a security interest on the 2007 Beaver Marquis motor home, and the State issued a title with the Bank as lien holder.

For approximately two years, Ott made timely loan payments, but in December 2008, Ott defaulted on the

loan. The Bank then sought to repossess the 2007 Beaver Marquis motor home on which it had a security interest. During these attempts to recover the motor home, the Bank learned that it had been fleeced by Ott: the 2007 Beaver Marquis motor home did not exist and the certificate of origin provided by Ott was a fabrication with a fake VIN. Monaco Coach, the manufacturer of Beaver Marquis motor homes, confirmed that it had never produced a vehicle with the VIN found on Ott's certificate of origin, nor had it ever issued a "Manufacturer's Certificate of Origin" for a vehicle with that number. During its investigation, the Bank discovered that Ott had defrauded several other financial institutions of millions of dollars.

There is an unanswered question about the nature and identity of the motor home inspected by Hintz when he visited Ott's dealership in October 2006. It is possible that the motor home inspected by Hintz was an older model 2003 Beaver Marquis motor home with a modified VIN plate containing a fake number, and that Ott then created a fraudulent certificate of origin with the matching fake VIN. Fourteen out of the seventeen digits from Ott's fake identification number matched up with the VIN of a 2003 motor home that existed at Ott's dealership at one time and was later repossessed by a different bank. But regardless of the unknown identity of the motor home inspected by Hintz, it is undisputed that the underlying collateral for the Bank's loan—a 2007 Beaver Marquis motor home with Ott's fake VIN—does not exist.

It is likely that if the Bank had taken certain additional steps it would have discovered Ott's fraud before the loan agreement was finalized. For example, when Hintz inspected the motor home, he apparently did not compare the features of the motor home he was viewing with Monaco Coach's manufacturer specifications for a 2007 motor home, which would have revealed differences. Also, the Bank failed to compare Ott's certificate of origin with an authentic certificate of origin from the manufacturer. If such a comparison had been made, the fabrication of Ott's certificate would have been obvious because his certificate has a caption and a signature of an unknown person different from those on an authentic certificate from Monaco Coach. Finally, the Bank did not verify with Monaco Coach that the VIN for Ott's 2007 motor home was legitimate. The question of whether it was necessary for the Bank to take these extra steps in order to make the loan to Ott in good faith is a matter of dispute between the parties, but it is not a deciding factor in this case.

After discovering the fraud, the Bank attempted to recover its loss of more than $370,000 through its insurance policy with Progressive. The relevant provision of the insurance bond states that Progressive agrees to indemnify the insured Bank for:

> (E) Loss resulting directly from the Insured having, in good faith, for its own account or for the account of others,
>
> . . . .
>
> > (3) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith

> of any item listed in (a) through (e) above which is a Counterfeit.

> Actual physical possession of the items listed in (a) through (h) above by the Insured, its correspondent bank or other authorized representative, is a condition precedent to the Insured's having relied on the faith of such items.

One of the items listed in (a) through (e) is a certificate of origin. The bond also defines the term "Counterfeit" as "a Written imitation of an actual, valid Original which is intended to deceive and to be taken as the Original."[1]

The Bank sought coverage for its loss from Progressive on the grounds that Ott's fraudulent certificate of origin was a "Counterfeit" on which the Bank had relied in granting the loan. Progressive disagreed with the Bank's interpretation of the bond and denied coverage. The Bank then filed suit against Progressive in the United States District Court for the Eastern District of Wisconsin and the parties consented to have a magistrate judge conduct all the proceedings in the case. After cross-motions for summary judgment, the magistrate judge determined that Ott's fraudulent certificate of origin was not a "Counterfeit" within the meaning of the bond, and ruled in favor of Progressive. The Bank now appeals.

---

[1] The term "Original" is defined in the bond as "the first rendering or archetype and does not include photocopies or electronic transmissions even if received and printed."

## II.

We review the district court's grant of summary judgment de novo. *First Nat'l Bank v. Cincinnati Ins. Co.*, 485 F.3d 971, 976 (7th Cir. 2007). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Also, we note that there is no dispute between the parties that Wisconsin law applies in this federal diversity suit.

The interpretation of an insurance policy is a question of law that we review de novo. *First Nat'l Bank*, 485 F.3d at 976. When interpreting an insurance policy, we seek "to determine and give effect to the intent of the contracting parties." *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 673 N.W.2d 65, 73 (Wis. 2004). That means that the policy language should be given "its common and ordinary meaning, that is, the meaning understood by a reasonable person in the position of the insured." *Siebert v. Wis. Am. Mut. Ins. Co.*, 797 N.W.2d 484, 490 (Wis. 2011). "However, we do not interpret insurance policies to provide coverage for risks that the insurer did not contemplate or underwrite and for which it has not received a premium." *Am. Family Mut. Ins. Co.*, 673 N.W.2d at 73.

In this case, the insurance bond that governs the coverage relationship between the Bank and Progressive is a standard financial-institution bond—namely, "Standard Form No. 24, Revised to April 1, 2004," a bond with "a well-chronicled history." *Universal Mortg. Corp. v. Württembergische Versicherung AG*, 651 F.3d 759, 761 (7th Cir. 2011). "Over the last century, nearly every term in the Form 24 bond has been developed in reaction to

court interpretations of prior versions of the bond. As a result, certain terms within the bond carry nuanced and well-established meanings." *Id.*

As the magistrate judge ably discussed in his well-reasoned opinion, this development has also happened with the term "Counterfeit." Earlier courts considering prior versions of the bond discussed the requirement that a counterfeit be not simply a fraudulent document meant to deceive, but also "an imitation or duplicate of a preexisting genuine original document." *Nat'l City Bank v. St. Paul Fire & Marine Ins. Co.*, 447 N.W.2d 171, 178-79 (Minn. 1989).[2] The current version of the standard Form 24 bond is the result of such development and contains a definition of "counterfeit" that " 'codifies' the case law requirement that there be an actual, valid original that the counterfeit document is imitating." SURETY ASSOC. OF AM., Financial Institution Bond, Standard Form No. 24, Form and Rider Filing, LOAN LOSS COVERAGE UNDER FINANCIAL INSTITUTION BONDS 673, 688 (Gilbert J. Schroeder and John J. Tomaine eds., ABA 2007). In his opinion, the magistrate judge quotes a helpful

---

[2] *See also, e.g., State Bank of the Lakes v. Kansas Bankers Sur. Co.*, 328 F.3d 906, 909 (7th Cir. 2003) ("[S]everal decisions have held that fake documentation pertaining to nonexistent chattels is not 'counterfeit.' "); *Capitol Bank of Chicago v. Fidelity & Cas. Co.*, 414 F.2d 986, 989 (7th Cir. 1969) ("Counterfeit means the imitation of an instrument that is authentic such that a party is deceived on the basis of the quality of the imitation.").

passage describing the rationale for insurance coverage based on this understanding of "counterfeit":

> [It] is to require that an insurance company cover only non-business losses or insured risks, with a bank responsible for ordinary business losses. An insured bank is not covered for mere loan losses resulting from a failure to follow sound business practices, since a bank can easily verify through minimal investigation if a fake document purports to be something that never was in existence. On the other hand, verifying the authenticity of a duplicate or imitation of a genuine document is unlikely to result in discovery of the fraud, a risk an insured bank cannot control. . . . If a bank . . . chooses not to follow sound business practices and fails to investigate, verify, examine, or even possess securities before remitting loan proceeds, it cannot successfully claim this is an insured risk and not an ordinary business loss.

*Nat'l City Bank*, 447 N.W.2d at 179 (internal citation omitted).

As we stated above, the specific language of the bond defines "Counterfeit" as "a Written imitation of an actual, valid Original which is intended to deceive and to be taken as the Original." The question then is whether Ott's fraudulent certificate of origin qualifies as a "Counterfeit" under this definition.

The Bank argues that Ott's certificate is an imitation of an actual, valid certificate of origin—namely, the certificate of the older model motor home passed off by Ott as the 2007 motor home he was supposedly pur-

chasing. But the Bank's argument misses the mark. Certainly, Ott's certificate of origin may imitate other certificates of origin in general, perhaps including that of the unidentified older motor home inspected by Hintz (though as best as we can tell, it is a poor imitation). The real problem, however, is that Ott's certificate of origin does not imitate an actual, original certificate of origin for a 2007 Beaver Marquis motor home because it is undisputed that there never was "an actual, valid Original" certificate of origin for the 2007 motor home pledged to the Bank as collateral for the loan. The manufacturer never issued a certificate of origin for a 2007 Beaver Marquis motor home with Ott's VIN because the manufacturer never produced a 2007 motor home with that identification number. Ott's certificate of origin is a complete fabrication and does not correspond to any actually existing certificate of origin or motor home. And without an actual, original certificate of origin, Ott's fraudulent certificate cannot be an imitation of "an actual, valid Original," and thus cannot qualify as a "Counterfeit" under the terms of the bond.

This understanding of the bond's language is further confirmed by the fact that the "Counterfeit" definition goes on to state that the "actual, valid Original" must be a document "to be taken as *the* Original." (emphasis added) In his opinion, the magistrate judge correctly observed that this wording strongly suggests that the fraudulent document cannot appear generally as "*an* Original" but instead must imitate a specific original document—"*the* Original." *See N. Shore Bank FSB v. Progressive Cas. Ins. Co.*, No. 10-C-71, slip op. at 11 (E.D. Wis. Apr. 15, 2011).

A denial of coverage for the Bank's loss in this case corresponds with the rationale we described earlier: "[A] bank can easily verify through minimal investigation if a fake document purports to be something that never was in existence. On the other hand, verifying the authenticity of a duplicate or imitation of a genuine document is unlikely to result in discovery of the fraud . . . ." *Nat'l City Bank*, 447 N.W.2d at 179. The parties' bond is intended to cover the risk of reliance on an imitation of a genuine document; it is not intended to cover the risk of reliance on a document that purports to be something that has never existed.

In sum, under the plain language of the insurance bond, Ott's certificate of origin is not "a Written imitation of an actual, valid Original which is intended to deceive and to be taken as the Original." Consequently, the Bank's loss as a result of Ott's fraudulent certificate does not qualify as a loss resulting from reliance on a "Counterfeit." Progressive is entitled to judgment as a matter of law, and we AFFIRM.[3]

---

[3] Progressive also makes the alternative argument that even if Ott's certificate of origin qualifies as a "Counterfeit" under the bond, the Bank failed to act in good faith when granting Ott the loan because it did not take the extra steps necessary to confirm the loan's legitimacy—and thus, the Bank is not entitled to recover its loss. We agree with the magistrate judge who found it unnecessary to consider this alternative argument because the "Counterfeit" issue is dispositive.